UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CORNELL D.M. JUDGE CORNISH,  )
                             )
            Plaintiff,       )
                             )
     v.                      )  Civil Action No. 07-0719 RWR
                             )
JON DUDAS, <u>et</u> <u>al</u>.,         )
                             )
            Defendants.      )
_____)

DEFENDANTS' MOTION TO DISMISS OR,
<u>IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT</u>

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules

of Civil Procedure, Defendants move to dismiss Plaintiff's

complaint, and answer the petition pursuant to Local Civil Rule

83.7.  In the alternative, Defendants move for summary judgment

in their favor, pursuant to Fed. R. Civ. P. 56(b).

Respectfully submitted,

_____
JEFFREY A. TAYLOR, DC Bar #498610
United States Attorney


_____
RUDOLPH CONTRERAS, DC Bar #434122
Assistant United States Attorney


_____/s/
W. MARK NEBEKER, DC Bar #396739
Assistant United States Attorney

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CORNELL D.M. JUDGE CORNISH,    )
                               )
            Plaintiff,         )
                               )
      v.                       )   Civil Action No. 07-0719 RWR
                               )
JON DUDAS, <u>et</u> <u>al</u>.,            )
                               )
            Defendants.        )
_____)

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS OR,
<u>IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT</u>

Although Plaintiff's complaint is unclear, it appears that he challenges the actions of the United States Patent and Trademark Office ("USPTO"), Office of Enrollment and Discipline ("OED"), in connection with Plaintiff's request for reinstatement to the USPTO register after a nearly nine-year hiatus. Plaintiff seeks legal redress for three alleged wrongdoings. First, it seems that Plaintiff is challenging OED's March 22, 2005, determination that he did not demonstrate to the satisfaction of OED Director that he still possessed the requisite qualifications be to placed back on the USPTO's register of patent practitioners without having to pass the USPTO patent examination (hereinafter "the reinstatement claim"). Second, in connection with the reinstatement claim, Plaintiff asserts that USPTO is preventing him from holding himself out (<u>e.g.</u>, advertising) as a registered patent attorney. Third, it appears that Plaintiff is trying to

assert that OED did not grant him certain reasonable accommodations in connection with the USPTO patent examination in violation of section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("the discrimination claim").

The Court should dismiss Plaintiff's reinstatement claim under Fed. R. Civ. P. 12(b)(1), because Plaintiff did not timely file his complaint and did not exhaust his administrative remedies prior to filing his complaint. Likewise, the Court should also dismiss Plaintiff's discrimination claim under Fed. R. Civ. P. 12(b)(6), because Plaintiff has not pled any facts establishing that he is a disabled person for purposes of the Rehabilitation Act. Alternatively, evidence regarding the discrimination claim shows that, as of the last time that Plaintiff took the Patent exam, OED had granted Plaintiff <u>all</u> of the accommodations that he requested. Therefore, the Court should grant summary judgment pursuant to Fed. R. Civ. P. 56(b) in Defendants' favor on that claim.

I. <u>Introduction</u>

In January 2005, Plaintiff submitted a request for reinstatement to OED. In response, OED offered Plaintiff the option of submitting documentation to establish his fitness to practice patent law before the USPTO in lieu of taking and passing the patent examination. Plaintiff submitted some

information, but, on March 22, 2005, OED determined that the submission was not sufficient to establish that Plaintiff still possessed the necessary qualifications to render valuable patent service, advice, and assistance to the public (i.e., clients). Notwithstanding its determination, OED informed Plaintiff that he could submit additional information regarding his fitness to practice patent law.

Plaintiff sat for the patent examination in July 2005, July 2006, and July 2007.  He did not come close to attaining a passing score on any of those occasions.  Plaintiff asked for accommodations for the regarding the 2006 and the 2007 examinations.  OED granted, in part, Plaintiff's requests for the 2006 examination because he did not provide sufficient medical documentation to support all of the requested accommodations. OED, however, provided Plaintiff with all of the reasonable accommodations that he requested for the 2007 examination after Plaintiff submitted additional medical documentation.

## II. Background

The USPTO is responsible for issuing patents.  35 U.S.C. § 2(a)(1).  Applying for a patent requires a thorough understanding of the patent laws and the regulations which govern the procedures before the USPTO.  In light of the breath and complexity of the issues arising during the application process,

- 3 -

patent applicants frequently retain the services of a trained patent attorney or agent to prepare and prosecute the application on their behalf.

A. Statutory Scheme for Registration before the USPTO

Congress has authorized the USPTO to govern the recognition and conduct of agents, attorneys, or other persons representing applicants or other parties having business before the USPTO. See 35 U.S.C. § 2(b)(2)(D).[1]  In order to protect the public from unethical and incompetent patent practitioners, Congress empowered the USPTO to require applicants seeking recognition to show that they are of good moral character and reputation and are possessed of the necessary qualifications to render valuable service, advice, and assistance.  See id.; Bender v. Dudas, 490 F.3d, 1361, 1363 (Fed. Cir. 2007) ("The USPTO has recognized the

_____

[1]  This section provides that the United States Patent and Trademark Office:

> may govern the recognition and conduct of agents, attorneys, or other persons representing applicants or other parties before the Office, and may require them, before being recognized as representatives of applicants or other persons, to show that they are of good moral character and reputation and are possessed of the necessary qualifications to render to applicants or other persons valuable service, advice, and assistance in the presentation or prosecution of their applications or other business before the Office

35 U.S.C. § 2(b)(2)(D).

- 4 -

need to regulate those who practice before it.  To this end, the USPTO has determined minimum levels of legal competence and has rigorously administered testing of those who seek to become registered patent agents and attorneys") (acronym amended for consistency).

    B. Regulatory Framework for Registration

    In accordance with this express authority, the USPTO promulgated regulations setting minimum standards concerning who may be registered as a patent attorney and  permitted to represent others before the USPTO in patent cases.[2]  See 37 C.F.R. § 11.10(a).  See also 35 U.S.C. § 33 ("Whoever, not being recognized to practice before the Patent and Trademark Office, holds himself out or permits himself to be held out as so recognized, or as being qualified to prepare or prosecute applications for patent, shall be fined not more than $1,000 for each offense").

    The applicable Rule that provides for review in this Court is as follows:

        A person refused recognition to practice or suspended
        or excluded from practice before the Patent Office may

_____

[2] The registration and testing requirements discussed in this brief do not apply to attorneys who represent others having *trademark* business before the USPTO.  This is relevant because, at times, it appears that Plaintiff confuses his ability to practice trademark law with his ability to practice patent law before the USPTO.

file a petition in this court against the Commissioner
of Patents for review of such action within 30 days
after the date of the order recording the
Commissioner's action.  The Commissioner shall answer
the petition within 20 days after receiving service of
the summons.  Within 11 days after filing of the
answer, the petitioner shall file a certified copy of
the record and proceedings before the Patent Office,
which shall constitute the sole basis for the court's
review.

Local Civil Rule 83.7.

1. <u>Requirements for Registration</u>

Individuals seeking registration must establish that they:

a)  possess good moral character and reputation;

b)  possess the legal, scientific, and technical
qualifications necessary to render applicants valuable
service; and

c)  are competent to advise and assist patent
applicants in the presentation and prosecution of their
applications before the USPTO.

<u>See</u> Exhibit 33[3] (Affidavit of Harry I. Moatz, ¶ 4.b); 37 C.F.R. §

11.7(a).  Individuals must take and pass the registration

examination to prove they are competent.  37 C.F.R. §

11.7(b)(1)(ii).

2. <u>Requirements for Reinstatement</u>

An individual may request to have his or her name removed

from the USPTO register.  However, if an individual seeks

---

[3]  The exhibits referred to herein are those previously provided
to the Court under seal in response to Plaintiff's request for a
preliminary injunction.

- 6 -

reinstatement more that five years after his or her name was removed, then the individual must again meet the requirements of 37 C.F.R. § 11.7, including the requirements to take and pass the registration examination.  1064 <u>Official Gazette</u> 12 (March 11, 1986) (attached hereto as Exhibit 14).  If these requirements are satisfied, then the individual will be reinstated.

3. Requirements for <u>Pro Se</u> Patent
and Trademark Applicants

An applicant for a patent or trademark does not have to hire a registered individual to prosecute his or her application. Rather, an applicant may represent himself or herself before the USPTO.  <u>See</u>, <u>e.g.</u>, 37 C.F.R. § 1.31.[4]

C. <u>Plaintiff's Registration History Before the USPTO</u>

1. <u>Plaintiff's Initial Registration with the USPTO</u>

Plaintiff applied for and passed the April 28, 1958, USPTO examination and was subsequently registered to practice before the USPTO.  <u>See</u> Exhibit 1.[5]  USPTO issued Plaintiff registration number 19,240.

2. <u>Client Grievance Against Plaintiff</u>

On November 7, 2005, one of Plaintiff's former clients filed a grievance with OED against Plaintiff.  <u>See</u> Exhibit 3.  The former client alleged that he had paid Plaintiff to prepare and

_____

[4] It appears from the complaint that Plaintiff mistakenly believes he cannot prosecute his own patent and trademark cases.

[5] Plaintiff did not initially attain a passing grade on the USPTO examination administered on August 6, 1957.  <u>See</u> Exhibit 2.

file a utility patent "continuation in part" application but that
Plaintiff failed to write the application in a timely manner and
eventually filed a *provisional* patent application without
obtaining the client's consent or signature.  See Exhibit 3.
The former client also alleged that Plaintiff had named himself
as a co-inventor on the filed application and then lied to the
client by saying doing so would not bestow any rights to
Plaintiff.  See Exhibit 3.

### 3. Plaintiff's Voluntary Removal from Maryland Bar Register

At or about the time the grievance was filed against
Plaintiff with OED, a complaint was filed against Plaintiff with
the Maryland State Bar.  The Maryland complaint also involved a
patent matter.  See Exhibit 4 (November 21, 1995, Consent Decree,
¶ 2).

As a result of the filing of the Maryland complaint,
Plaintiff and the Attorney Grievance Commission of Maryland
entered into a consent decree on November 21, 1995, permitting
Plaintiff to be placed in an "inactive status" of the Maryland
Bar.  See Exhibit 4.  In part, the consent decree notes
Plaintiff's admission that "he does not actively engage in
practice, occasionally does some 'pro bono' work, but that he
suffers lasting affects from open heart surgery in 1982 and he go
to rehabilitation every day and, rests for some time thereafter.
In addition he participates in Al Anon attending three (3) or

four (4) meetings a week as well as meeting with a sponsor." <u>See</u> Exhibit 4, ¶ 3. The decree also notes that "at the present time, he is unable and no desire to cope with the demands of the practice of law and agrees that it is in his best interest to be placed on inactive status." <u>See</u> Exhibit 4, ¶ 5.

On December 4, 1995, the Maryland Court of Appeals ordered that Plaintiff be placed on inactive status and his name removed from its register of attorneys (<u>see</u> Exhibit 5), and, on December 6, 1995, the Attorney Grievance Commission of Maryland notified USPTO of Plaintiff's removal from Maryland's attorney register. <u>See</u> Exhibit 6.[6]

### 4. <u>Plaintiff's Voluntary Removal from USPTO Register</u>

On February 8, 1996, Plaintiff sent a letter to USPTO stating that he had voluntarily changed his status in Maryland from active to inactive and that he was "ceasing the practice before the United States Patent and Trademark Office". <u>See</u> Exhibit 7. In response, former OED Director Karen L. Bovard sent a letter to Plaintiff on March 4, 1996, stating that the USPTO was "treating [his February 8 letter] as a request to have [his] name removed from the register." <u>See</u> Exhibit 8. Director Bovard's March 4 letter also informed Plaintiff that OED had received a letter from the Maryland Attorney Grievance Committee containing a copy of its December 4, 1995 order as well as a

---

[6] On October 3, 2003, the Maryland Court of Appeals approved Plaintiff's petition for reinstatement to the Maryland Bar.

grievance from a former client.  The Director's letter explained to Plaintiff:

> *It is our intent to hold in abeyance any investigation with respect to [the former client's] complaint, as well as any change of status action based on the Maryland Court order, unless you inform us in writing within thirty (30) days from the date of this letter that it is not your intent to have your name removed from the register.*

Exhibit 8 (emphasis added).  Director Bovard's March 4, 1996 letter also informed Plaintiff as follows:

> *If your name is removed from the register, you may be reinstated subject to satisfying the requirements for registration set forth in 37 C.F.R. § 10.7 and payment of the fee set forth in 37 C.F.R. § 1.21(a)(3).*

Exhibit 8 (emphasis added).  After sending the letter and allowing Plaintiff sufficient time to respond, OED Director Bovard removed Plaintiff's name from the USPTO register.[7] Moreover, because Plaintiff acquiesced to the removal of his name from the register, OED did not investigate the former client's charges against him.  See Exhibit 33 (Affidavit of Harry I. Moatz, ¶ 5).

### 5. Plaintiff's Suspension from U.S. District Court

On April 13, 1996, the U.S. District Court for the Southern District of New York suspended Plaintiff based on the action against him in Maryland.  See Exhibit 9 (February

---

[7] Plaintiff's name was removed from USPTO's register on or about August 28, 1996.  See Exhibit 8.

2, 2006 Order and Decision of the New York Supreme Court
describing the procedural history of Plaintiff's suspension).

### 6. Plaintiff's Suspension from the D.C. Bar

On April 15, 1996, the District of Columbia Court of
Appeals temporarily suspended Plaintiff from the practice of
law based on the Maryland action pending a recommendation
from the D.C. Board of Professional Responsibility.  See
Exhibit 10 (March 27, 1997, the District of Columbia Court of
Appeals describing procedural history of Plaintiff's
suspension).  The board subsequently recommended that
Plaintiff be suspended indefinitely with his reinstatement
being conditioned upon a showing of fitness, and, on March
27, 1997, the District of Columbia Court of Appeals suspended
Plaintiff indefinitely from the practice of law in the
District of Columbia *nunc pro tunc* to July 29, 1996.  See
Exhibit 10.[8]

### 7. Plaintiff's Suspension from the New York Bar

On August 17, 1998, the Supreme Court of New York
suspended Plaintiff for five years commencing on September
17, 1998, based on the actions of the Maryland Bar.  See
Exhibit 11.  The court order granted Plaintiff leave to file
for reinstatement upon furnishing satisfactory proof that he
refrained from practicing or attempting to practice law, has

---

[8] On November 16, 2000, Plaintiff was reinstated to the D.C.
Bar.

fully complied with the terms and conditions governing suspended attorneys, he has otherwise properly conducted himself, and that he has been reinstated to the practice of law in Maryland.  See Exhibit 11.[9]

The Supreme Court of New York also ordered that Plaintiff "desist and refrain from: 1) practicing law in any form, either as principal or agent, clerk or employee of another, 2) appearing as attorney or counselor-at-law before any court, Judge, Justice, board, commission or other public authority, 3) giving to another an opinion as to the law or its application or any advice in relation thereto, and 4) holding himself out in any way as an attorney and counselor-at law."  See Exhibit 11.

> 8.  The Request for Reinstatement
>     to the USPTO Register

On or about January 25, 2005, Plaintiff sought reinstatement to the USPTO register by submitting a "Data Sheet B Register of Patent Attorneys and Agents" form. See Exhibit 12.  It has been long-standing USPTO policy that a practitioner will be required to meet the USPTO qualifications where such the practitioner seeks reinstatement to the register five or more years after his or her name was removed therefrom.  See Exhibit 13; Exhibit 14, Exhibit 33 (Affidavit of Harry I. Moatz, ¶ 6).  Thus, by

---

[9] On February 2, 2006, Plaintiff was reinstated to the New York State Bar.

letter dated January 25, 2005, OED acknowledged the request for reinstatement and informed Plaintiff that, because it had been over five years since he was registered, he must take the patent registration examination or submit a showing to the satisfaction of the OED Director that he continued to possess the legal qualifications necessary to render valuable service for applicants for patent.  See Exhibit 13.

By letter dated January 26, 2005, Plaintiff elected to submit information regarding his legal qualifications.  See Exhibit 15.  Plaintiff's letter described that, during the prior eight year period, he continued to take continuing legal education classes, attended annual conferences of intellectual property associations, subscribed to intellectual property publications, regularly reviewed U.S. Patent Quarterly weekly advance sheets, and was involved in intellectual property research and other activities.  See Exhibit 15.  During most, if not all, of his hiatus, Plaintiff did not engage in the practice of law because the Supreme Court of New York had entered a "desist and refrain" order preventing Plaintiff from practicing any form of law before any type of forum for five years commencing in September 1998.

OED Staff Attorney William J. Griffin reviewed Plaintiff's submission.  See Exhibit 32 (Affidavit of William J. Griffin, ¶ 6.a).  Based on his review of Plaintiff's

- 13 -

submission, Mr. Griffin made a good-faith determination that Plaintiff did not present sufficient objective evidence to show that he continued to possess the legal qualifications necessary to render patent applicants valuable service.   See Exhibit 32 (Affidavit of William J. Griffin, ¶ 6.b).

By letter dated March 22, 2005, Mr. Griffin informed Plaintiff that his submission was insufficient to establish that Plaintiff still possessed the requisite legal qualifications after his nearly nine-year gap in practicing before the PTO.  See Exhibit 17.[10]  Mr. Griffin's letter informed Plaintiff that the determination was "without prejudice" and invited Plaintiff to submit additional information to support his qualifications.  See Exhibit 17.

Plaintiff applied for the July 2005 patent examination prior to submitting additional, substantive information about his qualifications in response to Mr. Griffin's March 22, 2005, letter.  See Exhibit 32 (Affidavit of William J. Griffin, ¶ 4.e).

### 9. The July 2005 Patent Test

On March 26, 2005, Plaintiff submitted an application for the July 2005 patent examination, i.e., Form PTO-158. See Exhibit 18.  Plaintiff checked the box on the form

---

[10] The March 22, 2005, letter contains a proof-reading error, namely: that Plaintiff "has not presented insufficient evidence". See Exhibit 33, ¶ 4.d.

indicating "I am applying for reinstatement . . . for a change from inactive to active status." See Exhibit 18.

On April 21, 2005, OED sent Plaintiff notice of admission to the July 11, 2005 examination, see Exhibit 19, and, on July 11, 2005, Plaintiff sat for the patent examination.  On August 15, 2005, OED notified Plaintiff that he did not pass the examination.  Plaintiff received a score of 46%.  A score of 70% or higher is required to pass the examination.  See Exhibit 20; Exhibit 33 (Affidavit of Harry I. Moatz, ¶ 7).

### 10. Plaintiff's Request for Accommodations for July 2006 Patent Test

On March 21, 2006, Plaintiff submitted his application for the July 2006 patent examination. See Exhibit 21. Plaintiff's application packet also included a four-page request for a reasonable accommodation.  See Exhibit 22. Specifically, Plaintiff asked for the examination to be enlarged to 14-point font, for the test date to be changed, an examination room apart from the other test takers, and additional time to take the test.

In support of his request for larger print, Plaintiff provided OED a July 5, 2005, note from Plaintiff's optometrist, Dr. Richard S. Simon, explaining, "due to cataracts in both eyes, this patient would benefit from larger print material when reading."   See Exhibit 22.

Regarding his request for a separate examination room, Plaintiff argued that his taking the test with persons who are not disabled "might expose me to ridicule, or coerce me unwillingly to reveal confidential, difficult or private explanation concerning my certification or my medical history. Such coercion would make the effect of the disability worse, or at least during the examination itself." See Exhibit 22. As for his request for additional time, Plaintiff only stated that such accommodations "would somewhat tend to lessen the coercion suffered." See Exhibit 22.[11]

By letter dated May 24, 2006,[12] OED granted Plaintiff's request in part. See Exhibit 23. Based on the medical information provided, OED granted Plaintiff's request for l4-point font on the examination. OED, however, denied his request for a different test date and a separate examination room because Plaintiff did not provide sufficient documentation supporting a disability entitling him to a

_____

[11] On April 3, 2006, and April 10, 2006, OED received additional correspondence from Plaintiff repeating his request for reasonable accommodations. See Exhibit 22A and Exhibit 22B.

[12] The letter was inadvertently dated "May 24, *2005*." See Exhibit 25 (explaining erroneous year).

medical accommodation.[13]  OED's May 24 letter to Plaintiff

explained its policy:

> *Supporting documentation, less than one year old,*
> *certifying the current severity of the disability*
> *and certifying that the accommodations requested*
> *are necessary for this disability must be sent by a*
> *licensed physician who has evaluated the condition.*

See Exhibit 23 (emphasis added).  OED provided Plaintiff the

opportunity to submit such documentation by June 26, 2006.

See Exhibit 23.

On June 6, 2006, Plaintiff submitted additional

information in support of his request for separate

examination room and additional time to take the test based

on an alleged heart problem.  See Exhibit 24.  In his letter,

Plaintiff argued that he should receive a second whole day to

complete the examination and be permitted to take the exam in

a private room because "it is obvious that an emergency heart

attack possibility is real."  See Exhibit 24.  Plaintiff

believed that he might suffer a heart attack during the

examination and, absent such accommodations, "the large

number of test takers would undoubtedly suffer from the

confusion of an emergency, and the one evacuated to a

hospital would also suffer from being forced to take a test

in a large room filled with many test takers."  See Exhibit

---

[13] OED's May 24, 2006 letter did not expressly address
Plaintiff's request for additional time.  It appears, however,
that the implied denial was tied to the denial of the separate
testing date.

- 17 -

24.  Plaintiff included a copy of his birth certificate and a
two-sentence letter dated from his cardiologist, Dr. George
Bren, stating, "Mr. Cornell D.M. Judge Cornish is under my
professional care for treatment of coronary heart disease."
See Exhibit 24.  "He had four-vessel coronary bypass surgery
in 1982, and had a stent placed in one of his bypass grafts
in 2003."  See Exhibit 24.

OED considered the information provided in Plaintiff's
June 6, 2006 letter, but denied his request for additional
time and a separate room on the basis that medical
documentation did not state that Plaintiff's medical
condition warranted the accommodations requested.  See
Exhibit 25.[14]

11. The July 12, 2006 Petition

On the same date Plaintiff sat for the July 12, 2006
patent examination, he filed a petition with USPTO
challenging: 1) OED's March 22, 2005, determination that
Plaintiff had not demonstrated that he still possessed the
requisite legal qualifications for practicing before the PTO
and 2) OED's denial of reasonable accommodations in
connection with the July 2005 patent examination.  See
Exhibit 27.  Plaintiff's petition included a June 28, 2006

_____

[14]  Exhibit 25 is an *undated* letter from OED to Plaintiff, but it
appears to have been sent in June 2006, i.e., after Plaintiff's
June 6, 2006 letter and prior to the July 12, 2006 examination
date.

- 18 -

letter from Dr. Bren stating, "He wanted me to inform the individuals who supervise the examination that he is 77 years old and that he would like to be permitted to have additional time allotted for the completion of the examination in view of his age and health issues related in part to his age." See Exhibit 27.

12. The July 2006 Patent Test

Plaintiff took the patent examination on July 12, 2006, with the benefit of 14-point font printing on the examination.  By letter dated August 16, 2006, OED informed Plaintiff that he did not pass the examination.  Plaintiff's score was 52%.  See Exhibit 26; Exhibit 33 (Affidavit of Harry I. Moatz, ¶ 8)

13. OED's Response to Plaintiff's
July 12, 2006, Petition and Related Materials

On or about September 13, 2006, Plaintiff submitted additional materials in connection with his July 12, 2006, petition including an application to sit for the next patent examination.  By letter dated November 30, 2006, OED offered the following accommodations to Plaintiff:

1) the examination and answer sheets will be appear in 14-point font;

2) several magnifiers for reading the Manual of Patent Examining Procedure (MPEP) will be provided;

3) a desk lamp for additional lighting will be provided;

4) permission for Plaintiff to bring his own
magnifying device; and

5) a mutually convenient date on or before January
31, 2007, to take the test.

Exhibit 28 at 3.

Regarding Plaintiff's request for a private examining
room, OED informed Plaintiff that, although his request for a
separate examination room was not supported, the issue was
moot because he would be the only person taking the
examination.  Id.  As to Plaintiff's request for additional
time, OED informed Plaintiff that the additional medical
documentation provided (i.e., the June 28, 2006, letter from
Dr. Bren) was not sufficient as it merely repeated
Plaintiff's desire to have additional time.  OED's November
30 letter, however, again identified the type of
documentation required to support a request for an
accommodation, i.e., "Supporting documentation, less than one
year old, certifying the current severity of the disability
and certifying that the accommodations requested are
necessary for this disability must be sent by a licensed
physician to who has evaluated the condition."  See Exhibit 28
at 3.  Plaintiff did not arrange to take the examination
prior to January 31, 2007.

14. Granting All of Plaintiff's Requests
for the 2007 Patent Examination

On or about December 13, 2006, Plaintiff submitted
additional medical information to support his request for
accommodations, namely: a December 12, 2006, note from
urologist, Dr. Fernando Bianco, M.D.  See Exhibit 28A.  Dr.
Bianco's note explained that the Plaintiff had a prostate
condition that required frequent visits to the restroom.  See
Exhibit 28A.

Plaintiff purportedly required frequent bathroom breaks.
Thus, OED provided him with extra time to take the
examination, namely four hours per session instead of three,
and the opportunity to take the examination over two days
instead of one.  (Affidavit of Harry I. Moatz, ¶ 10).  Also,
OED believed that Plaintiff might be disturbed when the
regular, three-hour session ended for the other examinees.
Thus, OED provided Plaintiff a room separate from the main
examination room. (Affidavit of Harry I. Moatz, ¶ 10).

Thereafter, as mentioned, Plaintiff submitted an
application for the July 2007 patent examination.[15]  In the
end, the parties agreed that Plaintiff would sit for the 2007

---

[15] Given that USPTO had offered Plaintiff the opportunity to take
the examination prior to January 31, 2007, without cost, it
refunded Plaintiff's $490 examination and application fee that
accompanied his 2007 application package.  See Exhibit 29.

without cost and be provided with the following
accommodations:

    1) the examination and answer sheets will be appear
in 14-point font;

    2) magnifiers for reading the MPEP will be
provided;

    3) additional lighting;

    4) a testing room separate from the main testing
room; and

    5) additional time to take the exam as follows:
        a) four hours (instead of three hours)
        per examination session;
        b) the first session administered on July
        16, 2007; and
        c) the second session administered on
        July 17, 2007.

See Exhibit 29.  In short, OED provided all of the
accommodations that Plaintiff requested in connection with
the July 2007 patent examination.  Id.

    15. Change in Plaintiff's Identification Number[16]

    In 1999, OED moved its database onto the OED Information
System (OEDIS).  To accomplish that switch, OED assigned new
identification numbers to practitioners who records were on
the old database.  The new identification number was "9000"
followed by the practitioner's registration number.  Thus, in

_____

[16] It appears from the complaint that Plaintiff mistakenly
believes that OED did not provide him with *his* test score but,
rather, the test score of another applicant.  Presumably
Plaintiff's confusion is based on the change of his registration
number from 900019240 to 41361.  See Exhibit 31, ¶ 4.

1999, Plaintiff's identification number became 900019240.
See Exhibit 31 (Affidavit of Christine M. Nucker).

On December 22, 2006, OED issued new identification
numbers to registered patent agents and attorney who had been
imported to OEDIS in 1999.   The former "9000" prefaced
identification number was changed to a five-digit number.
Thus, on December 20, 1996, Plaintiff's identification number
changed from 900019240 to 41361.   See Exhibit 31 (Affidavit
of Christine M. Nucker).

### 16. OED August 22, 2007 Letter and Filing of Complaint

Plaintiff sat for the patent examination on July 16 and
17, 2007, with the aforementioned numerous accommodations.
However, by letter dated August 22, 2007, which identified
Plaintiff using his new identification number, OED informed
Plaintiff that he did not pass the examination.   Plaintiff's
score was 48%.   See Exhibit 30; Exhibit 31; Exhibit 33
(Affidavit of Harry I. Moatz, ¶ 9).

On September 26, 2007, Plaintiff filed the instant
action and requested a preliminary injunction.

### III. Legal Standards

### A. Legal Standards for Motion to Dismiss

### 1. Lack of Subject Matter Jurisdiction

On a motion to dismiss for lack of subject matter
jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), the

plaintiff bears the burden of establishing that the court has subject-matter jurisdiction.  Freeman v. Fallin, 254 F.Supp.2d 52, 55-56 (D.D.C. 2003) (citing Tremel v. Bierman & Geesing, L.L.C., 2003 WL 721911, at 2 (D.D.C. 2003) and Rasul v. Bush, 215 F.Supp.2d 55, 61 (D.D.C. 2002)); Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) ("On a motion to dismiss for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has subject-matter jurisdiction").  The court may dismiss a complaint for lack of subject-matter jurisdiction only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Empagran S.A. v. F. Hoffman-LaRoche, Ltd., 315 F.3d 338, 343 (D.C. Cir. 2003) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).  Because subject-matter jurisdiction focuses on the court's power to hear the claim, however, the court must give the plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion for failure to state a claim.  Natural Resources Defense Council v. Johnson, 422 F.Supp.2d 105, 109-110 (D.D.C. 2006) (citing Macharia v. United States, 334 F.3d 61, 64, 69 (D.C. Cir. 2003); Hopkins v. Women's Division, 238 F.Supp.2d 174 (D.D.C. 2002); Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F.Supp.2d 9, 13 (D.D.C. 2001)).

And, in spite of the favorable inferences that a plaintiff receives on a motion to dismiss, it remains the plaintiff's burden to prove subject matter jurisdiction by a preponderance of the evidence. Id. (citing Am. Farm Bureau v. EPA, 121 F.Supp.2d 84, 90 (D.D.C. 2000); Pitney Bowes, Inc. v. United States Postal Serv., 27 F.Supp.2d 15, 18 (D.D.C. 1998)).

Moreover, the Court is not limited to the allegations contained in the complaint. Id. (citing Hohri v. United States, 782 F.2d 227, 241 (D.C. Cir. 1986), vacated on other grounds, 482 U.S. 64 (1987)). Instead, to determine whether it has jurisdiction over the claim, the Court may consider materials outside the pleadings. Id. (citing Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir. 1992)). Hence, where a document is referred to in the complaint and is central to plaintiff's claim, such a document attached to the motion papers may be considered without converting the motion to one for summary judgment. See Vanover v. Hantman, 77 F.Supp.2d 91, 98 (D.D.C. 1999), aff'd mem. No. 01-5032 (April 17, 2002).

2. Failure to State a Claim upon which Relief Can be Granted

In Bell Atlantic v. Twombly, ____ U.S. ____, 127 S.Ct. 1955 (2007), the Supreme Court recently refocused the analysis of when a plaintiff has alleged facts that can withstand a motion to dismiss and clarified the standards for evaluating whether a

- 25 -

complaint satisfies the general rules of pleadings pursuant to
Fed. R. Civ. P. 8.  In Twombly, the Court held that "plaintiff's
obligation to provide the 'grounds' of his 'entitle[ment] to
relief' requires more than labels and conclusions, and a
formulaic recitation of the elements of a cause of action will
not do," id. at 1964-65; that "[f]actual allegations must be
enough to raise a right to relief above the speculative level,, "
id.; and that a plaintiff must make "a 'showing,' rather than a
blanket assertion, of entitlement to relief," id. at 1965, n.3.
In so holding, the Court rejected a literal reading of the
Court's earlier statement in Conley v. Gibson, 355 U.S. 41, 45-46
(1957) that "a complaint should not be dismissed
. . . unless it appears beyond doubt that the plaintiff can prove
no set of facts in support of his claim which would entitle him
to relief."  The Court explained that this "phrase is best
forgotten as an incomplete, negative gloss on an accepted
pleading standard." Id. at 1969.   In addition, the Court
stressed that "[i]t is no answer to say that a claim just shy of
a plausible entitlement to relief can, if groundless, be weeded
out early in the discovery process through 'careful case
management.'" Id. at 1959.  Instead, the Court admonished, courts
should "tak[e] care to require allegations" that meet the Federal
Rules' threshold pleading requirements.  Id.

On a motion to dismiss for failure to state a claim upon
which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6),

this Court must construe the allegations and facts in the complaint in the light most favorable to the plaintiff and must grant the plaintiff the benefit of all inferences that can be derived from the alleged facts. See, e.g., Hopkins v. Women's Division, 238 F.Supp.2d at 178 (citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957) and Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994)). However, the Court need not accept inferences or conclusory allegations that are unsupported by the facts set forth in the complaint. Id. (citing Kowal, 16 F.3d at 1276). See also Mansfield v. Billington, 432 F.Supp.2d 64, 69 (D.D.C. 2006) ("While many well-pleaded complaints are conclusory, the court need not accept as true inferences unsupported by facts set out in the complaint or legal conclusions cast as factual allegations") (citing Warren v. Dist. of Columbia, 353 F.3d 36, 39 (D.C. Cir. 2004) and Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002)). Nor is the court required to draw argumentative inferences in favor of the Plaintiff. See Yamaha Motor Corp. v. United States, 779 F.Supp. 610, 611 (D.D.C. 1991) (citing 5A C. Wright & A. Miller, Federal Practice and Procedure, § 1350 at 218 (1990) and Norton v. Larney, 266 U.S. 511 (1925)).

In evaluating a motion to dismiss pursuant to Rule 12(b)(6), a court is limited to considering facts alleged in the complaint, any documents either attached to or incorporated in the complaint, matters of which the court may take judicial notice,

and maters of public record.  Flynn v. Tiede Zoeller, 412
F.Supp.2d 46, 50 (D.D.C. 2006) (citing EEOC v. St. Francis Xavier
Parochial School, 117 F.3d 621, 624 (D.C. Cir. 1997) and Marshall
County Health Care Auth. v. Shalala, 988 F.2d 1221, 1226, n.6.
(D.C. Cir. 1993)).  See also  Hopkins v. Women's Division, 238
F.Supp.2d at 178.

   B. Legal Standard for Motion for Summary Judgment

   When matters outside the pleadings are presented to and not
excluded by the court, and the court assures itself that such
treatment would be fair to both parties, a motion to dismiss may
be treated as one for summary judgment and disposed of as
provided in Fed. R. Civ. P. 56.  Id. (citing Americable Int'l
Inc. v. Dep't of the Navy, 129 F.3d 1271, 1274 n.5 (D.C. Cir.
1997) and Marshall County Health Care Auth., 988 F.2d at 1227)).
See also Judicial Watch, Inc. v. Clinton, 880 F.Supp. 1, 7
(D.D.C. 1995), aff'd 6 F.3d 1232 (D.C. Cir. 1996) (where court
considers evidence outside of the complaint, it is to treat a
motion to dismiss as one for summary judgment rather than a
motion to dismiss).

   Summary judgment is appropriate where there is no genuine
dispute as to any material fact and the moving party is entitled
to judgment as a matter of law.  See, e.g., Celotex Corp. v.
Catrett, 477 U.S. 317, 322-23 (1986).  Inferences drawn from the
facts must be viewed in the light most favorable to the party
opposing the motion.  See, e.g., Adickes v. S.H. Kress & Co., 398

U.S. 144, 157 (1970).

If summary judgment is to be denied, there must be evidence on which the jury could reasonably find for the plaintiff. Anderson v. Liberty Lobby, 477 U.S. 242, 252 (1986). But if the plaintiff "fails to make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial," summary judgment may be granted. Celotex, 477 U.S. at 322. The existence of a mere scintilla of evidence in support of nonmovant's position is insufficient to defeat the motion; there must be evidence on which a jury could reasonably find for the nonmovant. Powell v. National Bd. Of Medical Examiners, 364 F.3d 79, 84 (2d Cir. 2004) (citing Anderson, 477 U.S. at 252).

If the movant demonstrates an absence of a genuine issue of material fact, a limited burden of production shifts to the nonmovant, who must "demonstrate more than some metaphysical doubt as to the material facts," and come forward with "specific facts showing that there is a genuine issue for trial." Id. (citing Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)). If the nonmovant fails to meet this burden, summary judgment will be granted against it. Id. (citing Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994)).

IV. <u>Legal Analyses</u>

A. <u>Reinstatement Claim</u>

1. <u>Dismissal of Reinstatement Claim</u>

Plaintiff has not shown that the facts warrant his reinstatement. First, Plaintiff failed to have the OED decision, which denied his request for reinstatement, reviewed by the USPTO Director. Second, even if the OED decision can be the subject of review, Plaintiff failed to file a timely petition. Finally, to the extent that the Court has jurisdiction, Mr. Moatz and Mr. Griffin should be dismissed as a party.

a. <u>Failure to Exhaust His Administrative Remedies</u>

Pursuant to 35 U.S.C. § 32, anyone refused recognition to practice before the USPTO by the USPTO Director may have that decision reviewed by the district court for the District of Columbia. Thus, before filing a petition with this Court, the USPTO Director must first issue a decision.

Challenges to OED decisions involve a two-step process. The first step is to petition to the OED Director; the second step is to seek review of the OED Director's decision from the head of the USPTO. Under the applicable regulations:

> Any petition from any action or requirement of the staff of OED reporting to the OED Director shall be taken to the OED Director. Any such petition not filed within sixty days from the mailing date of the action or notice from which relief is requested will be dismissed as untimely.

37 C.F.R. § 11.2(c). Similarly, under the regulations:

> An individual dissatisfied with a final decision of the OED
> Director, except for a decision dismissing a complaint or
> closing an investigation, may seek review of the decision
> upon petition to the USPTO Director accompanied by payment
> of the fee set forth in Sec. 1.21(a)(5)(ii) of this
> subchapter. A decision dismissing a complaint or closing an
> investigation is not subject to review by petition. Any
> petition not filed within sixty days from the mailing date
> of the final decision of the OED Director will be dismissed
> as untimely.

37 C.F.R. § 11.2(d).

Plaintiff did not satisfy these requirements. On February 8, 1996, Plaintiff sent a letter to OED stating that he was "ceasing the practice before the United States Patent and Trademark Office." Exhibit 7. The OED Director informed Plaintiff in a letter that it received a grievance from a former client and that it would forgo any investigation concerning the grievance "unless [Plaintiff] inform us in writing within thirty (30) days from the date of this letter that it is not your intent to have your name removed from the register." Exhibit 8. The OED letter also informed Plaintiff that if his name was removed from the register, he would have to satisfy the requirements for registration in 37 C.F.R. § 11.7 before being reinstated. Id.

On January 25, 2005, Plaintiff sought reinstatement to the USPTO register. On March 22, 2005, OED staff attorney, William J. Griffin, informed Plaintiff that he would have to take and pass the registration examination to be reinstated because Plaintiff's name had been removed from the register for more than five years, and Plaintiff failed to provide any credible evidence

showing that he was competent to advise clients of patent laws or procedures.  After receiving Mr. Griffin's March 22, 2005, letter, Plaintiff submitted his application on April 4, 2005, for the July 2005 patent examination.  Over 2½-years later, Plaintiff filed his petition with this Court.  The USPTO Director has not issued a decision regarding Plaintiff's reinstatement request. Because this Court does not have a final agency action from the USPTO to review, i.e., a USPTO Director decision, it should dismiss the claim under Fed. R. Civ. P. 12(b)(1).  See Natural Resources Defense Council v. Johnson, 422 F.Supp.2d 105 (D.D.C. 2006)(defendant's motion to dismiss granted where court did not have Court does have jurisdiction over matter because defendant had not taken final agency decision); Ticor Title Ins. Co. v. FTC, 814 F.2d 731, 746 n.2 (D.C. Cir. 1987) (noting that the finality requirement applies to "agency action made reviewable by statute").  See also Rann v. Chao, 346 F.3d 192, 194-95 (D.C. Cir. 2003) (affirming the trial court's dismissal of the plaintiff's ADEA claim for failure to exhaust administrative remedies); Gillet v. King, 931 F.Supp. 9, 12-13 (D.D.C. 1996) (dismissing the plaintiff's Title VII claim because he failed to exhaust his administrative remedies).

    b. Plaintiff's Petition to this Court is Untimely
Even if Plaintiff's petition is somehow considered to be sufficient to provide this Court with jurisdiction over this case, this court should still dismiss Plaintiff's claim for

reinstatement pursuant to Fed. R. Civ. P. 12(b)(1) because Plaintiff did not file the reinstatement claim in a timely manner.

Local Civil Rule 83.7 permits persons refused recognition to practice before the USPTO to file a petition with this Court. The local rule, however, sets a 30-day limitations period. Plaintiff's petition fails to meet this filing deadline. Plaintiff complains about OED's March 22, 2005 letter requiring him to take and pass the registration examination because he did not establish that he still possessed the requisite legal qualifications after his nearly nine-year gap in practicing before the PTO.  Under Local Civil Rule 83.7, if Plaintiff wanted relief, he was required to file a petition in this Court within 30 days of March 22, 2005, in other words by April 22, 2005. Rather than file a timely petition, Plaintiff chose instead to take the registration examination over, and over, and over again. As explained below, Plaintiff retook the registration examination so many times because he never received a passing score.  It was only after Plaintiff failed the registration examination for the third time, and after over two years had passed since Mr. Griffin's March 22, 2005 letter that Plaintiff eventually decided to file a petition in this Court on September 26, 2007.  Because Plaintiff's petition is untimely, his reinstatement claim should be dismissed under Fed. R. Civ. P. 12(b)(1).  See O'Hair v. United States, 281 F.Supp. 815, 818 (D.D.C. 1968) (court granting

- 33 -

motion to dismiss after recognizing "[t]he first duty of the sole judge is to pass on the sufficiency of the complaint specifically as to whether or not a justiciable controversy is presented over which he has adjudicatory powers, and if he determines that the Court lacks jurisdiction, he must dismiss the suit"). Cf. Yamaha Motor Corp. v. United States, 779 F.Supp. 610 (D.D.C. 1991) (motion to dismiss granted pursuant to Fed. R. Civ. P. 12(b)(1) where court lacked jurisdiction over pre-enforcement tax assessments and collection process).

The same is true regarding all other reinstatement arguments Plaintiff may have that are based on USPTO actions arising prior to August 27, 2007, i.e., 30 days before his September 26, 2007 filing. Thus, the limitations period under Local Civil Rule 83.7 denies the Court jurisdiction over Plaintiff's challenge to OED's August 22, 2007 letter notifying Plaintiff that he did not pass the July 2007 patent examination.

c. Defendants Moatz and Griffin Should be Dismissed

To the extent the Court determines that it has jurisdiction over Plaintiff's reinstatement claim under 35 U.S.C. § 32 and does not grant Defendants' motion to dismiss the reinstatement claim under Fed. R. Civ. P. 12(b)(1), then it is appropriate for the Court to dismiss the defendants, Harry I. Moatz and William J. Griffin. By its plain terms, section 32 of title 35 of the U.S. Code grants the Court has jurisdiction over the USPTO Director, not Messrs. Moatz and Griffin. Cf. Gager v. Ladd, 212

- 34 -

F.Supp. 671 (D.D.C. 1963) (discussing authority under 35 U.S.C. § 32 to review of the "action of the Commissioner of Patents").

    2. <u>Dismissal of Reinstatement Claim</u>

In accordance with its mission to protect the public from incompetent practitioners, OED did not automatically reinstate Plaintiff to its register when he requested reinstatement in January 2005, after his nearly nine-year hiatus from practicing patent law.  There is no statutory or regulatory requirement for OED having to reinstate Plaintiff simply upon his request. Rather, the person seeking reinstatement is required to show to the satisfaction of the OED Director that her or she: 1) is of good moral character and reputation, 2) possesses the legal, scientific, and technical qualifications necessary for him or her to render applicants valuable service; and 3) is competent to advise and assist patent applicants in the presentation and prosecution of their applications before the Office.  <u>See</u> 37 C.F.R. § 11.7(a).

It is not disputed that, while Plaintiff was inactive from the practice of patent law, there were numerous changes in the United States patent laws and regulations.  For example, Congress amended 35 U.S.C. § 102 in 1999 and again in 2002, 35 U.S.C. § 103 in 1999 and 2004, and 35 U.S.C. § 154 in 1999 and 2002.  Nor is it disputed that, in accordance with its policy, OED endeavored to ensure that Plaintiff still possessed the requisite qualifications to conduct patent business before the USPTO by

offering the Plaintiff the opportunity to establish his qualification by submitting a statement or by taking and passing the patent examination.  See 37 C.F.R. § 11.7(a).

Plaintiff has not articulated how OED's March 22, 2005 determination violated any law, rule or regulation pertaining to USPTO's authority under 35 U.S.C. § 2(b)(2)(D) to govern the recognition and conduct of agents, attorneys, or other persons representing applicants or other parties having business before the USPTO.  Neither his mere disagreement with OED' determination regarding his request for reinstatement or his conclusory allegation of purported arbitrary and capricious action by OED adequately states a basis for relief.  See Twombly, supra; Washington Bldg. Realty Corp. v. Peoples Drug Stores, Inc., 161 F.2d 879, 880 (D.C. Cir. 1947) (per curiam) (court granting motion to dismiss cross claim where pleading does not state actionable claim). Cf. Gager v. Ladd, 212 F.Supp. 671 (D.D.C. 1963) (dismissing action for mandatory injunction to compel USPTO to allow plaintiff to sit for next patent examination where USPTO did not abuse discretion in holding that plaintiff had failed to show that he had met standards for examination).  Therefore, the Court may grant Defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).

B. <u>Discrimination Claims</u>

   1. <u>Dismissal of Numerous Discrimination Claims</u>

Plaintiff alleges intermittently throughout his complaint that the USPTO violated named and unnamed federal anti-discrimination laws by not providing him reasonable accommodation when he sat for the USPTO patent examinations in 2006 and 2007.[17] Plaintiff's case, however, has nothing to do with any of the discrimination laws cited in his Complaint.

Plaintiff has not alleged an existing or prospective employment relationship with the USPTO; therefore, he necessarily has failed to state a cause of action under: 1) Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, which prohibits employment discrimination on bases of race and color, as well as national origin, sex, and religion; 2) the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 <u>et</u> <u>seq.</u>, which protects individuals who are 40 years of age or older from employment discrimination based on age; 3) the Equal Employment Opportunity Act of 1972 (Pub. L. 92-261), which amended the Civil

---

[17] <u>See</u> <u>generally</u> Complaint at 4 (allegation of age and medical history discrimination); <u>id.</u> at 5 (allegation of discrimination); <u>id.</u> at 18 (allegation of age discrimination and lack of reasonable accommodation); <u>id.</u> at 21-23 (reference to Age Discrimination in Employment Act of 1967); <u>id.</u> at 21(reference to Equal Employment Opportunity rights); <u>id.</u> at 23 (references to Title VII of the Civil Rights Act, Individuals with Disabilities Education Act Disability Act, the Older Workers Benefit Protection Act, the Civil Rights Act of 1991 and the Equal Employment Opportunity Act of 1967 [sic]); <u>id.</u> at 27 (allegation of discriminatory testing in favor of young, healthy, white males).

Rights Act of 1964 to promote further equal employment opportunities for American workers; 4) the Older Workers Benefit Protection Act of 1990 (Pub. L. 101-433), which amended several sections of the ADEA to clarify the protections given to older workers such as in regard to employee benefit plans; 5) title I of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 et seq., which prohibits discrimination on the basis of disability in employment; or 6) section 115 of the Civil Rights Act of 1991 (Pub.L. 102-166), which amended section 7(e) of the ADEA (29 U.S.C. § 626(e)).  Likewise, Plaintiff's complaint against the Defendants does not concern public education; therefore, he has failed to state a claim under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 et seq., which requires public schools to make available to all eligible children with disabilities a free appropriate public education in the least restrictive environment appropriate to their individual needs. Because none of those laws apply to Defendants in this case, the Court may properly dismiss those claims pursuant to Fed. R. Civ. P. 12(b)(6).

Nor do the other titles of the ADA apply to Plaintiff's allegations against the USPTO.  The ADA prohibits discrimination on the basis of disability in transportation (Title II); in the services, programs, or activities of all State and local governments (Title II); in public accommodations provided by private entities (Title III); and in telecommunications for hearing

and speech-impaired individuals (Title IV).  Plaintiff has not pled
any facts that state a claim under those sections of the ADA
against Defendants; therefore, the Court may properly dismiss those
claims pursuant to Fed. R. Civ. P. 12(b)(6) as well.

### 2. Dismissal of Rehabilitation Act Claim

It seems that a fair reading of the Complaint suggests that
Plaintiff may be alleging a violation of section 504 of the
Rehabilitation Act, 29 U.S.C. § 794.  Section 504 prohibits
discrimination in programs conducted by Federal agencies on the
basis of disability, including a failure to grant a reasonable
accommodation in order to have access to such programs.  Assuming
Plaintiff seeks relief under section 504 of the Rehabilitation Act,
however, the Complaint is fatally defective because Plaintiff has
failed to allege that he is a disabled person under that law.
Section 504 states, "No otherwise qualified individual with a
disability in the United States, as defined in section 705(20) of
this title, shall, solely by reason of her or his disability, be
excluded from the participation in, be denied the benefits of, or
be subjected to discrimination under any program or activity
receiving Federal financial assistance or under any program or
activity conducted by any Executive agency or by the United States
Postal Service."  29 U.S.C. § 794(a).  Thus, to state a claim under
section 504 of the Rehabilitation Act in this case, Plaintiff must
prove: 1) he is a "qualified individual with a disability" and 2)
that he was subject to discrimination under a program conducted by

- 39 -

the USPTO.  29 U.S.C. § 794(a).  Cf. Powell v. National Board of Medical Examiners, 364 F.3d 79, 85 (2d Cir. 2004) (in order for medical student who brought action against medical school and national board of medical examiners to establish a prima facie violation under 504 of the Rehabilitation Act and the Americans with Disabilities Act, she must demonstrate: 1) she is a qualified individual with a disability; 2) that the defendants are subject to one of the acts; and 3) that she was "denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or [was] otherwise discriminated against by defendants, by reason of [her] disabilit[y].") (citing Henrietta D. v. Bloomberg, 331 F.3d 261, 273 (2d Cir. 2003)).  In order to invoke protection under section 504 of the Rehabilitation Act, Plaintiff must initially show that he is disabled person within purview of statute.  See Smaw v. Virginia Dep't of State Police, 862 F.Supp. 1469, 1472 (E.D. Va. 1994).  "Disability" under the Rehabilitation Act means "a physical or mental impairment that substantially limits one or more major life activities."  29 U.S.C. § 705(9)(B). See also Smaw, 862 F.Supp at 1472.  "Major life activities" under the Rehabilitation Act has been defined to mean "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." Roe v. Housing Auth. of the City of Boulder, 909 F.Supp. 814, 820 (D. Colo. 1995) (citing Jasany v. United States Postal Service, 755 F.2d 1244 (6th Cir. 1985)).

Plaintiff fails to state a cause of action under section 504 because he has not alleged that he is handicapped within the meaning of the Rehabilitation Act.  Specifically, Plaintiff has not pled that his eye and prostate health problems substantially limit a major life activity.  Because Plaintiff is not a qualified individual with a disability, the Court may properly dismiss this aspect of his complaint pursuant to Fed. R. Civ. P. 12(b)(6).  See, e.g., Smaw, 862 F.Supp at 1475 (even assuming the Plaintiff's obesity was a physical impairment, it is not the type of impairment which substantially limits her ability to pursue employment and, therefore, did not qualify for protection under the Rehabilitation Act); Torres v. U.S. Postal Service, 610 F.Supp. 593 (N.D. Texas 1985) (defendants are not liable under the Rehabilitation Act because plaintiff was not a "handicapped individual" by virtue of his left-handedness); Chandler v. City of Dallas, 2 F.3d 1385, 1390 (5th Cir. 1993) (claims under Rehabilitation Act fail where plaintiffs failed to establish that they were handicapped and otherwise qualified, either with or without reasonable accommodation); McGuinness v. Univ. of New Mexico School of Medicine, 170 F.3d 974 (10th Cir. 1998) (court affirming granting of summary judgment under the Rehabilitation Act, 29 U.S.C. § 794, where Plaintiff was not a "qualified individual with a disability" because Plaintiff's anxiety disorder, which manifested itself when he took chemistry and mathematics tests, did not constitute a disability).

2. <u>Summary Judgment on the Rehabilitation Act Claim</u>

Even if one assumes that Plaintiff is a handicapped person for purposes of section 504 of the Rehabilitation Act, the undisputed facts establish that the USPTO did not discriminate against him.  USPTO is obligated to provide a *reasonable* accommodation under the Rehabilitation Act.  <u>See</u>, <u>e.g.</u>, <u>American Council of the Blind v. Paulson</u>, 463 F.Supp.2d 51, 58 (D.D.C. 2006) (Rehabilitation Act entitles plaintiff only to such accommodations as are "reasonable" not to perfect access or to remedies that are specially tailored to his or her circumstances) (citing <u>Alexander v. Choate</u>, 469 U.S. 287, 301 (1985)).

Following the July 2006 examination, OED and Plaintiff ultimately agreed to the following accommodations:

> 1) the examination and answer sheets will be appear in 14-point font;
>
> 2) magnifiers for reading the MPEP will be provided;
>
> 3) additional lighting;
>
> 4) a testing room separate from the main testing room; and
>
> 5) additional time to take the exam as follows:
>
>> a)  four hours (instead of three hours) per examination session;
>>
>> b)  the first session administered on July 16, 2007; and
>>
>> c)  the second session administered on July 17, 2007.

See Exhibit 29.    Thus, OED provided all of the accommodations
that Plaintiff requested in connection with the July 2007 patent
examination.   See Exhibit 29.  And, even though Plaintiff has not
applied to take the patent examination again, the USPTO would
continue to provide him with the same accommodations that it
provided for the July 2007 examination should he so request.
Exhibit 33 (Affidavit of Harry I. Moatz, ¶ 11).

    In light of such undisputed evidence, the Court properly may
properly grant summary judgment in favor of Defendants.   Powell
v. National Bd. of Medical Examiners, 364 F.3d 79 (2d Cir. 2004)
(court granting summary judgment under section 504 of
Rehabilitation Act for defendant where defendant denied request
by Plaintiff, who had twice failed the licensing examination, for
an accommodation of more time to take the examination due to a
learning disability because the evidence was clear that defendant
followed its standard procedure when it determined that plaintiff
was not entitled to a test accommodation); Mershon v. St. Louis
University, 442 F.3d 1069, 1073-1074 (8th Cir. 2006) (summary
judgment proper under section 504 of Rehabilitation Act where
plaintiff fails to establish a factual dispute on an essential
element of the case) (citation omitted).   Cf. Nichols v. Harford
Cty. Bd. Of Education, 189 F.Supp.2d 325, 335-340 (D. Maryland
2002) (failure to accommodate claim under section 504 of
Rehabilitation Act in an employment context failed as *a matter of*

*law* where it was evident that defendant adequately accommodated Plaintiff's disability).

V. <u>Conclusion</u>

For the reasons stated herein, Defendants respectfully request that their motion be granted.

Respectfully submitted,

_____
JEFFREY A. TAYLOR, DC Bar #498610
United States Attorney


_____
RUDOLPH CONTRERAS, DC Bar #434122
Assistant United States Attorney

                                          /s/
_____
W. MARK NEBEKER, DC Bar #396739
Assistant United States Attorney

OF COUNSEL:

Steve Walsh
Acting Solicitor

Ronald K. Jaicks
Sydney O. Johnson, Jr.
Associate Solicitors

United States Patent and Trademark Office
Madison West, 08C43
600 Dulany Street
Alexandria, Virginia 22314

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CORNELL D.M. JUDGE CORNISH,    )
                               )
            Plaintiff,         )
                               )
        v.                     )  Civil Action No. 07-0719 RWR
                               )
JON DUDAS, et al.,             )
                               )
            Defendants.        )
_____)

STATEMENT OF MATERIAL FACTS AS TO
WHICH THERE IS NO GENUINE DISPUTE

Plaintiff's Initial Registration with the USPTO

1.  Plaintiff applied for and passed the April 28, 1958,
USPTO examination and was subsequently registered to practice
before the USPTO and issued Plaintiff registration number 19,240.
See Exhibit 1.

Client Grievance Against Plaintiff

2.  On November 7, 2005, one of Plaintiff's former clients
filed a grievance with OED against Plaintiff.  See Exhibit 3.

3.  The former client alleged that he had paid Plaintiff to
prepare and file a utility patent "continuation in part"
application but that Plaintiff failed to write the application in
a timely manner and eventually filed a *provisional* patent
application without obtaining the client's consent or signature.
See Exhibit 3.

4.  The former client also alleged that Plaintiff had named
himself as a co-inventor on the filed application and then lied

to the client by saying doing so would not bestow any rights to
Plaintiff.  <u>See</u> Exhibit 3.

> ### Plaintiff's Voluntary Removal
> ### <u>from Maryland Bar Register</u>

5.  At or about the time the grievance was filed against
Plaintiff with OED, a complaint was filed against Plaintiff with
the Maryland State Bar involving a patent matter.  <u>See</u> Exhibit 4
(November 21, 1995, Consent Decree, ¶ 2).

6.  As a result of the filing of the Maryland complaint,
Plaintiff and the Attorney Grievance Commission of Maryland
entered into a consent decree on November 21, 1995, permitting
Plaintiff to be placed in an "inactive status" of the Maryland
Bar.  <u>See</u> Exhibit 4.

7.  In part, the consent decree notes Plaintiff's admission
that "he does not actively engage in practice, occasionally does
some 'pro bono' work, but that he suffers lasting affects from
open heart surgery in 1982 and he go to rehabilitation every day
and, rests for some time thereafter.  In addition he participates
in Al Anon attending three (3) or four (4) meetings a week as
well as meeting with a sponsor."  <u>See</u> Exhibit 4, ¶ 3.

8.  The decree also notes that "at the present time, he is
unable and no desire to cope with the demands of the practice of
law and agrees that it is in his best interest to be placed on
inactive status."  <u>See</u> Exhibit 4, ¶ 5.

9.  On December 4, 1995, the Maryland Court of Appeals ordered that Plaintiff be placed on inactive status and his name removed from its register of attorneys (see Exhibit 5), and, on December 6, 1995, the Attorney Grievance Commission of Maryland notified USPTO of Plaintiff's removal from Maryland's attorney register. See Exhibit 6.

### Plaintiff's Voluntary Removal from USPTO Register

10.  On February 8, 1996, Plaintiff sent a letter to USPTO stating that he had voluntarily changed his status in Maryland from active to inactive and that he was "ceasing the practice before the United States Patent and Trademark Office". See Exhibit 7.

11.  In response, former OED Director Karen L. Bovard sent a letter to Plaintiff on March 4, 1996, stating that the USPTO was "treating [his February 8 letter] as a request to have [his] name removed from the register." See Exhibit 8.

12.  Director Bovard's March 4 letter also informed Plaintiff that OED had received a letter from the Maryland Attorney Grievance Committee containing a copy of its December 4, 1995 order as well as a grievance from a former client.

13.  The Director's letter explained to Plaintiff:

> *It is our intent to hold in abeyance any investigation with respect to [the former client's] complaint, as well as any change of status action based on the Maryland Court order, unless you inform us in writing within thirty (30) days from the date of this letter that it is not your intent to have your name removed from the register.*

- 3 -

Exhibit 8 (emphasis added).

13.  Director Bovard's March 4, 1996 letter also informed Plaintiff as follows:

> *If your name is removed from the register, you may be reinstated subject to satisfying the requirements for registration set forth in 37 C.F.R. § 10.7 and payment of the fee set forth in 37 C.F.R. § 1.21(a)(3).*

Exhibit 8 (emphasis added).

14.  After sending the March 4, 1996 letter and allowing Plaintiff sufficient time to respond, OED Director Bovard removed Plaintiff's name from the USPTO register on or about August 28, 1996.  See Exhibit 8.

15.  Because Plaintiff acquiesced to the removal of his name from the register, OED did not investigate the former client's charges against him.  See Exhibit 33 (Affidavit of Harry I. Moatz, ¶ 5).

### Plaintiff's Suspension from U.S. District Court

16.  On April 13, 1996, the U.S. District Court for the Southern District of New York suspended Plaintiff based on the action against him in Maryland.  See Exhibit 9 (February 2, 2006 Order and Decision of the New York Supreme Court describing the procedural history of Plaintiff's suspension).

### Plaintiff's Suspension from the D.C. Bar

17.  On April 15, 1996, the District of Columbia Court of Appeals temporarily suspended Plaintiff from the practice of law based on the Maryland action pending a recommendation from the

- 4 -

D.C. Board of Professional Responsibility.  See Exhibit 10 (March 27, 1997, the District of Columbia Court of Appeals describing procedural history of Plaintiff's suspension).

18.  The D.C. Board of Professional Responsibility subsequently recommended that Plaintiff be suspended indefinitely with his reinstatement being conditioned upon a showing of fitness, and, on March 27, 1997, the District of Columbia Court of Appeals suspended Plaintiff indefinitely from the practice of law in the District of Columbia *nunc pro tunc* to July 29, 1996. See Exhibit 10.

19.  On November 16, 2000, Plaintiff was reinstated to the D.C. Bar.

Plaintiff's Suspension from the New York Bar

20.  On August 17, 1998, the Supreme Court of New York suspended Plaintiff for five years commencing on September 17, 1998, based on the actions of the Maryland Bar.  See Exhibit 11.

21.  The court order granted Plaintiff leave to file for reinstatement upon furnishing satisfactory proof that he refrained from practicing or attempting to practice law, has fully complied with the terms and conditions governing suspended attorneys, he has otherwise properly conducted himself, and that he has been reinstated to the practice of law in Maryland.  See Exhibit 11.

22.  The Supreme Court of New York also ordered that Plaintiff "desist and refrain from: 1) practicing law in any

form, either as principal or agent, clerk or employee of another, 2) appearing as attorney or counselor-at-law before any court, Judge, Justice, board, commission or other public authority, 3) giving to another an opinion as to the law or its application or any advice in relation thereto, and 4) holding himself out in any way as an attorney and counselor-at law." See Exhibit 11.

> The Request for Reinstatement
> to the USPTO Register

23.  On or about January 25, 2005, Plaintiff sought reinstatement to the USPTO register by submitting a "Data Sheet B Register of Patent Attorneys and Agents" form. See Exhibit 12.

24.  It has been long-standing USPTO policy that a practitioner will be required to meet the USPTO qualifications where such the practitioner seeks reinstatement to the register five or more years after his or her name was removed therefrom. See Exhibit 13; Exhibit 14, Exhibit 33 (Affidavit of Harry I. Moatz, ¶ 6).

25.  Thus, by letter dated January 25, 2005, OED acknowledged the request for reinstatement and informed Plaintiff that, because it had been over five years since he was registered, he must take the patent registration examination or submit a showing to the satisfaction of the OED Director that he continued to possess the legal qualifications necessary to render valuable service for applicants for patent.  See Exhibit 13.

26.  By letter dated January 26, 2005, Plaintiff elected to submit information regarding his legal qualifications.  See Exhibit 15.

27.  Plaintiff's letter described that, during the prior eight year period, he continued to take continuing legal education classes, attended annual conferences of intellectual property associations, subscribed to intellectual property publications, regularly reviewed U.S. Patent Quarterly weekly advance sheets, and was involved in intellectual property research and other activities.   See Exhibit 15.

28.  During most, if not all, of his hiatus, Plaintiff did not engage in the practice of law because the Supreme Court of New York had entered a "desist and refrain" order preventing Plaintiff from practicing any form of law before any type of forum for five years commencing in September 1998.

29.  OED Staff Attorney William J. Griffin reviewed Plaintiff's submission.  See Exhibit 32 (Affidavit of William J. Griffin, ¶ 6.a).

30.  Based on his review of Plaintiff's submission, Mr. Griffin made a good-faith determination that Plaintiff did not present sufficient objective evidence to show that he continued to possess the legal qualifications necessary to render patent applicants valuable service.   See Exhibit 32 (Affidavit of William J. Griffin, ¶ 6.b).

31.  By letter dated March 22, 2005, Mr. Griffin informed Plaintiff that his submission was insufficient to establish that Plaintiff still possessed the requisite legal qualifications after his nearly nine-year gap in practicing before the PTO.  See Exhibit 17.

32.  The March 22, 2005, letter contains a proof-reading error in the nature of a double negative, namely: that Plaintiff "has not presented insufficient evidence" when, in context the letter was intended to explain that Plaintiff had not presented sufficient evidence.   See Exhibit 32, ¶ 6; Exhibit 33, ¶ 4.d.

33.  Mr. Griffin's letter informed Plaintiff that the determination was "without prejudice" and invited Plaintiff to submit additional information to support his qualifications.  See Exhibit 17.

34.  Plaintiff applied for the July 2005 patent examination prior to submitting additional, substantive information about his qualifications in response to Mr. Griffin's March 22, 2005, letter.  See Exhibit 32 (Affidavit of William J. Griffin, ¶ 4.e).

The July 2005 Patent Test

35.  On March 26, 2005, Plaintiff submitted an application for the July 2005 patent examination, i.e., Form PTO-158.  See Exhibit 18.

36.  Plaintiff checked the box on the form indicating "I am applying for reinstatement . . . for a change from inactive to active status."  See Exhibit 18.

37.  On April 21, 2005, OED sent Plaintiff notice of admission to the July 11, 2005 examination, <u>see</u> Exhibit 19, and, on July 11, 2005, Plaintiff sat for the patent examination.  <u>See</u> Exhibit 33 (Affidavit of Harry I. Moatz, ¶ 7).

38.  On August 15, 2005, OED notified Plaintiff that he did not pass the examination; Plaintiff had received a score of 46%. <u>See</u> Exhibit 20; Exhibit 33 (Affidavit of Harry I. Moatz, ¶ 7).

39.  A score of 70% or higher was required to pass the examination.  <u>See</u> Exhibit 20; Exhibit 33 (Affidavit of Harry I. Moatz, ¶ 7).

Plaintiff's Request for Accommodations<br><u>for July 2006 Patent Test</u>

40.  On March 21, 2006, Plaintiff submitted his application for the July 2006 patent examination. <u>See</u> Exhibit 21.

41.  Plaintiff's application packet also included a four-page request for a reasonable accommodation.  <u>See</u> Exhibit 22. Specifically, Plaintiff asked for the examination to be enlarged to 14-point font, for the test date to be changed, an examination room apart from the other test takers, and additional time to take the test.  <u>Id</u>.

42.  In support of his request for larger print, Plaintiff provided OED a July 5, 2005, note from Plaintiff's optometrist, Dr. Richard S. Simon, explaining, "due to cataracts in both eyes, this patient would benefit from larger print material when reading."  <u>See</u> Exhibit 22.

43.  Regarding his request for a separate examination room, Plaintiff argued that his taking the test with persons who are not disabled "might expose me to ridicule, or coerce me unwillingly to reveal confidential, difficult or private explanation concerning my certification or my medical history. Such coercion would make the effect of the disability worse, or at least during the examination itself."  See Exhibit 22.

44.  As for his request for additional time, Plaintiff only stated that such accommodations "would somewhat tend to lessen the coercion suffered."  See Exhibit 22.

45.  On April 3, 2006, and April 10, 2006, OED received additional correspondence from Plaintiff repeating his request for reasonable accommodations.  See Exhibit 22A and Exhibit 22B.

46.  By letter of May 24, 2006, OED granted Plaintiff's request in part; however, the letter was inadvertently dated "May 24, 2005."  See Exhibit 23 and Exhibit 25 (explaining erroneous year).

47.  Based on the information provided, OED granted Plaintiff's request for 14-point font on the examination;  OED, however, denied his request for a different test date and a separate examination room because Plaintiff did not provide sufficient documentation supporting a disability entitling him to a medical accommodation.

48.  OED's May 24 letter to Plaintiff explained its policy:

- 10 -

> *Supporting documentation, less than one year old,*
> *certifying the current severity of the disability and*
> *certifying that the accommodations requested are*
> *necessary for this disability must be sent by a*
> *licensed physician who has evaluated the condition.*

See Exhibit 23 (emphasis added).

49.  OED provided Plaintiff the opportunity to submit such documentation by June 26, 2006. See Exhibit 23.

50.  On June 6, 2006, Plaintiff submitted additional information in support of his request for separate examination room and additional time to take the test based on an alleged heart problem. See Exhibit 24.

51.  In his June 6, 2006 letter, Plaintiff argued that he should receive a second whole day to complete the examination and be permitted to take the exam in a private room because "it is obvious that an emergency heart attack possibility is real." See Exhibit 24.

52.  Plaintiff believed that he might suffer a heart attack during the examination and, absent such accommodations, "the large number of test takers would undoubtedly suffer from the confusion of an emergency, and the one evacuated to a hospital would also suffer from being forced to take a test in a large room filled with many test takers." See Exhibit 24.

53.  Plaintiff included a copy of his birth certificate and a two-sentence letter dated from his cardiologist, Dr. George Bren, stating, "Mr. Cornell D.M. Judge Cornish is under my professional care for treatment of coronary heart disease." See

- 11 -

Exhibit 24.  "He had four-vessel coronary bypass surgery in 1982, and had a stent placed in one of his bypass grafts in 2003."  <u>See</u> Exhibit 24.

54.  OED considered the information provided in Plaintiff's June 6, 2006 letter, but denied his request for additional time and a separate room on the basis that medical documentation did not state that Plaintiff's medical condition warranted the accommodations requested.  <u>See</u> Exhibit 25.[1]

<u>The July 12, 2006 Petition</u>

55.  On the same date Plaintiff sat for the July 12, 2006 patent examination, he filed a petition with USPTO challenging: 1) OED's March 22, 2005, determination that Plaintiff had not demonstrated that he still possessed the requisite legal qualifications for practicing before the PTO and 2) OED's denial of reasonable accommodations in connection with the July 2005 patent examination; but there is no dispute that, to date, the USPTO Director has not issued a decision regarding Plaintiff's reinstatement request.  <u>See</u> Exhibit 27; Complaint.

56.  Plaintiff's petition included a June 28, 2006 letter from Dr. Bren stating, "He wanted me to inform the individuals who supervise the examination that he is 77 years old and that he would like to be permitted to have additional time allotted for

_____

[1] Exhibit 25 is an *undated* letter from OED to Plaintiff, but it appears to have been sent in June 2006, <u>i.e.</u>, after Plaintiff's June 6, 2006 letter and prior to the July 12, 2006 examination date.

the completion of the examination in view of his age and health issues related in part to his age." See Exhibit 27.

<u>The July 2006 Patent Test</u>

57.  Plaintiff took the patent examination on July 12, 2006, with the benefit of 14-point font printing on the examination.

58.  By letter dated August 16, 2006, OED informed Plaintiff that he did not pass the examination.  Plaintiff's score was 52%. <u>See</u> Exhibit 26; Exhibit 33 (Affidavit of Harry I. Moatz, ¶ 8).

OED's Response to Plaintiff's
<u>July 12, 2006, Petition and Related Materials</u>

59.  On or about September 13, 2006, Plaintiff submitted additional materials in connection with his July 12, 2006, petition including an application to sit for the next patent examination; and by letter dated November 30, 2006, OED offered the following accommodations to Plaintiff:

1) the examination and answer sheets will be appear in 14-point font;

2) several magnifiers for reading the Manual of Patent Examining Procedure (MPEP) will be provided;

3) a desk lamp for additional lighting will be provided;

4) permission for Plaintiff to bring his own magnifying device; and

5) a mutually convenient date on or before January 31, 2007, to take the test.

Exhibit 28 at 3.

60.  Regarding Plaintiff's request for a private examining room, OED informed Plaintiff that, although his request for a

separate examination room was not supported, the issue was moot because he would be the only person taking the examination.  <u>Id</u>.

61.  As to Plaintiff's request for additional time, OED informed Plaintiff that the additional medical documentation provided (<u>i.e.,</u> the June 28, 2006, letter from Dr. Bren) was not sufficient as it merely repeated Plaintiff's desire to have additional time.  <u>Id</u>.

62.  OED's November 30 letter, however, again identified the type of documentation required to support a request for an accommodation, <u>i.e.</u>, "Supporting documentation, less than one year old, certifying the current severity of the disability and certifying that the accommodations requested are necessary for this disability must be sent by a licensed physician to who has evaluated the condition." <u>See</u> Exhibit 28 at 3.

63.  Plaintiff did not arrange to take the examination prior to January 31, 2007.

> Granting All of Plaintiff's Requests
> <u>for the 2007 Patent Examination</u>

64.  On or about December 13, 2006, Plaintiff submitted additional medical information to support his request for accommodations, namely: a December 12, 2006, note from urologist, Dr. Fernando Bianco, M.D.  <u>See</u> Exhibit 28A.

65.  Dr. Bianco's note explained that the Plaintiff had a prostate condition that required frequent visits to the restroom. <u>See</u> Exhibit 28A.

66.  Plaintiff purportedly required frequent bathroom breaks; thus, OED provided him with extra time to take the examination, namely four hours per session instead of three, and the opportunity to take the examination over two days instead of one.  Exhibit 33 (Affidavit of Harry I. Moatz, ¶ 10).

67.  Also, OED provided Plaintiff a room separate from the main examination room.  Id.  Thereafter, as mentioned, Plaintiff submitted an application for the July 2007 patent examination. See id.

68.  Given that USPTO had offered Plaintiff the opportunity to take the examination prior to January 31, 2007, without cost, it refunded Plaintiff's $490 examination and application fee that accompanied his 2007 application package.  See Exhibit 29.

69.  In the end, the parties agreed that Plaintiff would sit for the 2007 without cost and be provided with the following accommodations:

    1) the examination and answer sheets will be appear in 14-point font;

    2) magnifiers for reading the MPEP will be provided;

    3) additional lighting;

    4) a testing room separate from the main testing room; and

    5) additional time to take the exam as follows:
        a) four hours (instead of three hours) per examination session;
        b) the first session administered on July 16, 2007; and
        c) the second session administered on July 17, 2007.

- 15 -

<u>See</u> Exhibit 29.

70.  In short, OED provided <u>all</u> of the accommodations that Plaintiff requested in connection with the July 2007 patent examination.  <u>Id</u>.

### Change in Plaintiff's Identification Number

71.  In 1999, OED moved its database onto the OED Information System (OEDIS); and to accomplish that switch, OED assigned new identification numbers to practitioners who records were on the old database.  <u>See</u> Exhibit 31 (Affidavit of Christine M. Nucker).

72.  The new identification number was "9000" followed by the practitioner's registration number; thus, in 1999, Plaintiff's identification number became 900019240.  <u>Id</u>.

73.  On December 22, 2006, OED issued new identification numbers to registered patent agents and attorney who had been imported to OEDIS in 1999.  The former "9000" prefaced identification number was changed to a five-digit number.

74.  Thus, on December 20, 1996, Plaintiff's identification number changed from 900019240 to 41361.  <u>See</u> Exhibit 31 (Affidavit of Christine M. Nucker).

### OED August 22, 2007 Letter and Filing of Complaint

75.  Plaintiff sat for the patent examination on July 16 and 17, 2007, with the aforementioned numerous accommodations. <u>See</u>

- 16 -

Exhibit 30; Exhibit 31; Exhibit 33 (Affidavit of Harry I. Moatz, ¶ 9).

76.  By letter dated August 22, 2007, which identified Plaintiff using his new identification number, OED informed Plaintiff that he did not pass the examination.  See Exhibit 30; Exhibit 31; Exhibit 33 (Affidavit of Harry I. Moatz, ¶ 9)

77.  Plaintiff's score on the July 2007 exam was 48%, yet to pass the exam one must receive a score of 70% or better.  See Exhibit 30; Exhibit 31; Exhibit 33 (Affidavit of Harry I. Moatz, ¶¶ 7-9).

78.  On September 26, 2007, Plaintiff filed the instant action and requested a preliminary injunction.

Respectfully submitted,

_____
JEFFREY A. TAYLOR, DC Bar #498610
United States Attorney


_____
RUDOLPH CONTRERAS, DC Bar #434122
Assistant United States Attorney


_____/s/
W. MARK NEBEKER, DC Bar #396739
Assistant United States Attorney

- 17 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that service of the foregoing Defendants'

Motion To Dismiss, Or In The Alternative, For Summary Judgment,

and a proposed Order has been made by mailing copies thereof to:

CORNELL D.M. JUDGE CORNISH, ESQ.
Suite 301
1101 New Hampshire Ave., N.W.
Washington, DC  20037-1502

on this 7th day of November, 2007.


                                                 /s/
W. MARK NEBEKER, DC Bar #396739
Assistant United States Attorney
555 4th Street, N.W.
Civil Division
Washington, DC  20530
(202) 514-7230
fax: (202) 514-8780