UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

CORNELL D.M. JUDGE CORNISH,              )
                                         )
            Plaintiff *Pro Se*           )
                                         )
            v.                           )    CASE 07-cv-01719 (RWR)
                                         )
JON DUDAS, et al.,                       )
                                         )
            Defendants                   )
_____  )

## Motion For Order To Reopen the Record, andRequiring Defendants To Supply Certified Copies of Record

This is a Motion for an Order To Reopen the Record, and to Require Defendants To Supply Certified Copies of the Record.  A Memorandum of Points and Authorities In Support is attached.

Defendants 1/15/08 filing misconstrues Plaintiff's case, is a serious misconstruction of the interface between patent law and the First Amendment, and it raises new issues and novel theories not based on fact to support their Motion to Dismiss.

This Motion is timely filed with a request to supplement it until 2/7/08, which is the choke point requested by Defendants for an enlargement of time for them to respond to filing by Plaintiff.

This is also a request to file under seal, it being understood that that is a formal requirement to comply with the Defendants Unopposed Motion [4] for Leave to Seal and the Court's two

**RECEIVED**

JAN 2 2 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

1

Orders [6] of 10/15/07 and [23] of 12/10/07 to seal the proceedings, and Plaintiff's Motion [10]

of 10/22/07 to continue the Seal Order until at least the final hearing.

Respectfully submitted,

*Cornell D. M. Judge Cornish*

Cornell D.M. Judge Cornish
1101 New Hampshire Ave., NW
Suite 301
Washington, DC 20037-1502
(202) 429-9705
cornishj@erols.com

Date:  1/22/08

2

**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

CORNELL D.M. JUDGE CORNISH,       )
                                  )
          Plaintiff *Pro Se*      )
                                  )
v.                                )          CASE  07-cv-01719 (RWR)
                                  )
JON DUDAS, et al.,                )
                                  )
          Defendants              )
_____ )

Memorandum Of Points and Authorities In Support Of Motion To Reopen The Record,

Including For Discovery; And For Order Requiring Defendants to Supply Certified Copies of

Plaintiff's Spotless Record, Including An Ineffective Investigation That Was Waived In Favor of

Plaintiff and Which Is Unenforceable Under The Statute of Limitations; For A Completion of

Plaintiff's FOIA Requests; And For Enlargement of Time To Answer Defendants' 12/30/07 and

1/4/08 Motions [32 and 34] By Deferral Of A Decision On Defendants' Motion To Dismiss

Until At Least 2/28/08

Defendants licensed Plaintiff to advertise his name as an attorney in the USPTO on

November 5, 1958. They, or their predecessors, were not appointed with authority under Article

II, Section 2, cl. 2 of the Constitution to preempt the First Amendment by *prior restraint* of the

Plaintiff's advertisements. Thus, Plaintiff challenges the constitutionality of the Regulations and

the evidentiary presumptions under which the Defendants secretly revoked Plaintiff's property

rights and privileges and immunities in his license to advertise in the USPTO without pre- or

post-revocation hearings. Even the potential loss of livelihood through revocation of his license

to advertise as an attorney is aptly categorized as a *property* right. Attorney Grievance

1

Commission of Maryland v. Bear, Misc. Docket AG No. 32, Dec. 8, 2000 (CA Md), page14. In

Barry v. Barchi, 433 U.S. 55 (1979), the Court held that the appellee had a protectable *property*

interest in his license under state law sufficient to invoke due process protections. In Supreme

Court of Virginia v. Friedman, 487 U.S. 59 (1988), the Court held that he had a Constitutional

right to protection from *prior restraint* to hold himself out as an attorney under the Privileges and

Immunities Clause of the United States Constitution, Art. IV, 2 cl. 2.

Defendant secretly revoked Plaintiff's license to advertise his name as an attorney in the

USPTO on August 28, 1996 without any pre- or post revocation hearing in this case, and they are

now keeping that revocation in full force and effect by their Motion to Dismiss, and by

subjecting Plaintiff to discrimination without reasonable accommodations, while irreparably

injuring Plaintiff by *prior restraint* of his advertisements of his name as an attorney.

To allow Plaintiff to advertise again after a post-revocation hearing based upon a waived

investigation Defendants insist that he must apply for re-examination to take the Patent Office

examination without reasonable accommodations. Once he is pre-approved to take and pass the

Patent Office examination, which Plaintiff has already done in 1958, he is presumed to comply

with the regulations established under 35 C.F.R. 2 (b)(2)(D) and 32, whereby he can advertise.

He can also practice in the Patent Office as an attorney of "good moral character and reputation"

who can render to applicants or other persons valuable service, advice, and assistance in the

presentation or prosecution of their applications or other business before the Office," and "by...

advertising" promote and publish his name as an attorney under 35 U.S.C. 2 and 32.

But Defendants must meanwhile allow Plaintiff to promote himself by advertisements in

his own patents and trademarks without *prior restraint* because the regulations do not pre-empt

the First Amendment. Still further, Defendants are not authorized to revoke Plaintiff's license to

2

advertise under their Regulations, they have not revoked his license after a pre- or post-revocation hearing, nor are they authorized by Congress to revoke Plaintiff's license to advertise without pre- or post-revocation hearings.

Plaintiff challenges the constitutionality and the evidentiary presumptions for revoking his license to advertise under the Defendants' Rules, and the evidentiary presumptions they use for restraining, suppressing, infringing, interfering with and revoking his license to advertise, and the presumptions they use to edit, restrain, suppress and censor Plaintiff's advertisements under those Rules.

The Defendants admit to *prior restraint* of Plaintiff advertisements under their Regulations, and those of all other lawyers who advertise their names as attorneys in the PTO without being registered there as "active." It is immaterial as to whether or not they or their liberty, property rights or privileges and immunities have been revoked rationally or irrationally, or legitimately or illegitimately with or without a pre-revocation or a post-revocation hearing. Privacy rights are also blatantly ignored. But, as held in Barry v. Barchi, 433 U.S. 55 (1979), the Plaintiff has a property interest in his NY state license to practice and to hold himself out as an attorney in the USPTO because he has a property interest in that license. In this connection, it is undisputed that Plaintiff has a property interest in his NY and USPTO licenses to practice state patent and trademark law, and federal trademark law without registration by the USPTO because they cannot be revoked by discretion alone. His PTO license, whether registered or not in the USPTO, is recognized by the Defendants, and it cannot constitutionally be revoked or suspended at the discretion of the Defendants without a pre-revocation or post-revocation hearing. *See* Note 2 on page 3 of Defendants' 10/16/07 Answer [7].

3

Under the applicable USPTO regulations and New York statute Sec. 8022, Plaintiff's license cannot be revoked constitutionally by discretion alone. He is entitled to a pre-revocation or post-revocation hearing. 35 U.S.C. 141, 145 and 146 specify no time within which a pre- or post-revocation hearing must be held. That is unconstitutional and lethal under Freedman v. Maryland, 380 U.S. 51 (1964); it violates the privileges and immunities clause. *See* Supreme Court of Virginia v. Friedman, 487 U.S. 59 (1988). In NY the statute affords the Board as long as 30 days after the hearing in which to issue a final order, and ordains that, "[p]ending such hearing and final determination thereon, the action of the [Board] in…suspending a license…shall remain in full force and effect." In Federal District Court, where the plaintiff in Barry, *Id.*, challenged the constitutionality of Section 8022 and the evidentiary presumption under the Board's rules, the court held that Section 8022 was unconstitutional under the Due Process Clause, since it permitted the State to sanction without either a pre-suspension or a prompt post-suspension hearing.

Likewise, Plaintiff's PTO license cannot be suspended or revoked by discretion alone, nor can the Defendants revoke Plaintiff's state or USPTO licenses in Maryland, DC and New York by discretion alone. His licensies can't be revoked or suspended at the discretion of the PTO authorities or the Defendants. The plaintiff has a property interest in his licenses because they cannot be revoked or suspended at the discretion of the PTO authorities or the Defendants. It is *irrational* to hold that the PTO authorities or the Defendants have discretion from Congress to revoke Plaintiff's state or PTO licenses to practice trademark law in the PTO and/or in the states by discretion alone, as they have done in this case.

In Goldstein v. Moatz, No. 05-1144 (CA 4th ) and No. 05-1399 (DC EDVA  Apr. 20, 2006), the revocation of Goldstein's license was the result of an OED investigation pursuant to

4

the PTO's regulations in which the OED Director was responsible for investigating all

allegations of misconduct by practitioners in the patent bar. *See* 37 C.F.R. 10.131 (a). He is

obliged to convene the PTO's Committee on Discipline (the "Committee") *Id.*, 10,132 (a),

composed of at least three PTO staff attorneys appointed by the Commissioner for Patents, *Id.*,

10.4 (a), and it decides the issue of probable cause on whether a disciplinary rule has been

violated, *Id.*, 10.4 (b). If the Committee makes a probable cause finding, the Director initiates

formal disciplinary proceedings by the filing of a complaint against the practitioner and by

referring the matter to an administrative law judge for the pre-revocation hearing required by the

Constitution and *Id.*, 10.132 (b), but which is not currently authorized by Congress under Art. II,

Section 2, cl.2. No such pre-revocation hearing or post-revocation hearing was granted to

Plaintiff because his license was revoked secretly without notice to him at a date that is still

uncertain because Defendants waived the hearing on March 4, 1996 as shown in the 10/16/07

and 12/20/07 filings [7 and 24] in Exhibit 8.

In Burmeister, *Id.*, a stay Order was granted for a period of up to three years to file for

"reinstatement" to take the Patent Examination after an admission of conduct that resulted in a

suspension on ethical grounds in the state of Illinois. Defendants claimed that Order was

sufficient to support their complaint pursuant to 35 U.S.C. 32 and 37 C.F.R. 10.134. The

complaint was issued by the PTO Committee on Discipline after issuing its August 11, 1999

"Determination of Probable Cause" to bring charges against the Respondent Bumeister under 37

C.F.R. 10.23 (b) and 10.23 (c)(5) in the "state suspension matter."

The Order required the Respondent to provide status reports in six month increments

regarding appellate proceedings, which the Respondent did. And on February 20, 2003, an

Order was issued reminding the parties of the expiring stay and requesting their input regarding

5

further appropriate proceedings in the case. The record was closed after Post-Hearing Briefs

were filed. The date the record closed with the filing of Complainant's Reply Brief on January

14, 2004. There was adequate proof establishing misconduct, as follows:

A. Disciplinary Rules

The Disciplinary Rules involved were Regulations governing the representation of

others before the Patent and Trademark Office providing at 37 C.F.R. 10.130 (a), in

pertinent part, that "[t]he Commissioner may, after notice and opportunity for a

hearing, (1) reprimand or (2) suspend or exclude,...any individual [or]

attorney...shown to be incompetent or disreputable, who is guilty of gross

misconduct, or who violates a Disciplinary Rule." *See also,* 35 U.S.C. 32 (2003).

The complaint alleged that Mr. Burmeister violated the PTO's Disciplinary Rules set

forth in 37 C.F.R. 10.23 (b)(1), (b)(6) and (c)(5) which provide, in relevant part, that:

(b) A practitioner shall not:

(1) Violate a Disciplinary Rule

\* \* \*

(6) Engage in any other conduct that adversely reflects on the practitioner's fitness to

practice before the Office.

\* \* \*

(c) Conduct which constitutes a violation of paragraph [ ]...(b) of this section includes...

\* \* \*

6

(5) Suspension or disbarment from practice as an attorney or agent on ethical grounds by any duly constituted authority of a State...

B. Standard of Proof

The Regulations governing the representation of others before the Patent and Trademark Office provide at 37 C.F.R. 10.149, that:

In a disciplinary proceeding, the Director shall have the burden of proving his or her case by clear and convincing evidence and a respondent shall have the burden of proving any affirmative defense by clear and convincing evidence.

In this case the Maryland Order of December 4, 1995, was not a disciplinary proceeding. It was an Order in favor of Plaintiff in order to absolve him from the required payments due from an active attorney who makes his living by the practice of law in Maryland. See, for example, In re Clancy, 675 A,2d 493 (DC 1996); and In re Ruffin, 369 Md. 238, 252; 798 A.2d 1139, 1147 (2002).

It was not a suspension, license revocation or disbarment from practice as an attorney or agent on ethical grounds by any duly constituted authority of a State. In the letter of March 22, 2005 in Exhibit 17 [7 and 24], Defendant Griffin characterized Plaintiff's inactivity in Maryland as a placement "on disability inactive status with the Maryland State bar," which is not duly constituted authority of a State. It did not reflect on the practitioner's fitness to practice before the Office. It didn't constitute a violation of paragraph [ ]...(b) of this section (cited above), nor was there a claim that it did in a "complaint" issued after the PTO Committee on Discipline issued a "Determination of Probable Cause." There was no notice and opportunity for a hearing, reprimand or exclusion from practice in Maryland or anywhere else. There was a lack of adequate proof establishing misconduct.

7

Defendants coerced Plaintiff not to advertise his name as an attorney in the Trademark Office by the "strategic mooting" that held an investigation in abeyance on March 4, 1996. The final Decision of Defendants *prior restraint* was filed with notice of the revocation of Plaintiff's license in their Answer [7] on 10/16/07.

That final Decision censored Plaintiff's license to advertise his state patent and trademark law licenses in Maryland, DC. NY and in the USPTO, because those licenses are not preempted by the Constitution or statutes. In fact, the First Amendment protects Plaintiff's right to advertise all of his patent and trademark and other licenses in the PTO without *prior restraint,* since Congress has no authority to preempt the First Amendment.

Defendants admit that they have no such authority in the Trademark Office of the USPTO. *See, e.g.,* Note 2 on page 3 of Defendants' 10/16/07 Answer [7], which states that "The registration and testing requirements discussed in this brief do not apply to attorneys who represent others having trademark business before the USPTO," (albeit the Defendants use their "testing requirement" to suppress and censor Plaintiff's advertisements in his patents and trademarks by *prior restraint* in the USPTO without authority from Congress).

Under law, it is irrational to hold that Plaintiff's licenses to practice patent and/or trademark law in the states, and/or to practice the same in the USPTO, selectively in the Patent and/or Trademark Offices respectively, can be revoked or suspended by Defendants at their discretion. *See* 35 U.S.C. 32, wherein Congress provided that the "Director *may*, after notice and opportunity for a hearing, suspend or exclude, either generally or in any particular case, from further practice before the Patent and Trademark Office any person, agent, or attorney shown to be incompetent or disreputable, or guilty of gross misconduct, or who does not comply with the regulations established under section 2 (b) (2) (D) of this title, or who shall, by word, circular,

8

letter, or advertising, with intent to defraud in any manner, deceive, mislead, or threaten any applicant or prospective applicant, or other person having immediate or prospective business before the Office (emphasis added).

Moreover, Plaintiff has been irrationally barred by *prior restraint* from advertising any subject matter for any "utility" or design, such as an "icon" in the case of Plaintiff's current applications S.N's 29/273,235 and 77/247,319.

Plaintiff instead, is irrationally required to apply for reinstatement to take the Patent Office Examination, and then discriminated against because of his certified and undisputed age and age related disabilities by not being provided with reasonable accommodations for his age and age related disabilities. That discrimination is imposed irrationally no matter what the purpose of the exam, e.g., whether it be for Continuing Legal Education, mere academic purposes or any other purpose. Furthermore, and again irrationally, Plaintiff is required to apply for reinstatement to take the examination, because it is the exclusive and only means used for determining his "good moral character and reputation" and "necessary qualifications" to advertise (albeit, the requirement is indirectly and deceptively stated as a requirement to reapply for reinstatement to take the exam again to assuage their guilty conscience and bias to discriminate against Plaintiff in favor young, healthy, white men by revoking his state and PTO licenses to practice or hold himself out to practice trademark or patent law anywhere at any time or place, in any and all venues without a pre- or post-revocation hearing of any kind, and without notice or an opportunity for a hearing as specified in 35 U.S.C. 32.

All attorneys not registered in the PTO have to pass the exam, but none are allowed to take the Examination unless their application for reinstatement to take the examination is pre-approved. This qualification for reinstatement to take the exam must be pre-approved even if

9

there is a presumption that the Defendants treat disciplinary matters "less seriously or wholly inconsistently with the manner exercised by the Courts," including those in Maryland, DC, NY, the District Courts of the Eastern and Southern Districts of New York, the Supreme Court of the United States, the Court of Appeals of the Federal Circuit and the U.S. Tax Court. *See* Sabghir, 350 Md. At 83, 710 A.21d at 934 (quoting Attorney Grievance Comm'n v. Gittens, 346 Md. 316, 327, 697 A.2d 83, 88 (1977); and AGC v. Bear, Misc. Docket AG No. 32, Dec. 8, 2000; or even if the Defendants fail to give full faith and credit or deference to those courts; or those Courts show that there is sufficient, independent, persuasive, weighty, irrefutable and conclusive factual evidence and  proof, as there is in the case of Plaintiff in this case, that the applicant is by virtue of good standing in the bars of Maryland, DC, NY and several federal courts, is of "good moral character and reputation" and qualified and competent to "render to applicants and other persons valuable service, advice, and assistance in the presentation or prosecution of their applications or other business before the Office," as stated in 35 U.S.C. 2 (b)(2)(D).

It does not matter what the purpose of the exam is. For example, the purpose may be for Continuing Legal Education purposes, or even merely academic reasons. Even if they limit their practice to the Trademark Office, they still must be *registered* "as attorneys" to advertise themselves as "attorneys" no matter what the "subject matter" or "utility" of the application or the purpose of the advertisement under 35 U.S.C. 101 and 112. The truth of the advertisement is immaterial to the Defendants' requirements under 35 U.S.C. 2 (b)(2)(D) or 35 C.F.R. 10.7. It is immaterial whether the "subject matter" of the advertisement is a Design or a Trademark.  The advertisement subject to *prior restraint* may be the expression of a trademark attorney, or a patent attorney; it may be in an application for a trademark, or a design, plant, or utility patent, but in any and all cases, the attorney who irrationally must pass the examination, must first apply

10

for reinstatement to take the exam, and then pass it in order to obtain registration independently of any factual evidence submitted or presumption of "qualification" and "competence" or "good moral character and reputation."

All attorneys have to be on the register of attorneys currently or else their advertisements are subject to *prior restraint*. And Defendants admit to *prior restraint* of all advertisements of all attorneys' names as attorneys for any and all purposes. The same *prior restraint* applies to all or any "utility" in connection with the appearance or practice of any or all attorneys with the PTO without a registration and there are no exceptions. The rule applies irrationally and universally to all attorneys, whether they appear or practice in the Patent Office or the Trademark Office respectively alone or together, as in the case of Plaintiff who practices *pro se* in the Patent Office and for others and himself in the Trademark Office. And these "rules" of *prior restraint* apply to all attorneys, with reference to any Administrative Record, and whether or not there is an Administrative Record in connection with any particular *prior restraint* of any particular attorneys' advertisements.

So basically, the Defendants are obstructing justice by preventing any Administrative review or access to the courts in connection with their *prior restraint* except by direct access to this Court in this case where they have irrationally asked this Court to approve and enable their *prior restraint* and obstruction of justice as an accessory to their Motion to Dismiss, and in so doing to irrationally approve of the illegal, unprecedented, irrational and secret revocation of Plaintiff's liberty, property, privacy rights, as well as his privileges and immunities in his state and PTO licenses to practice and hold himself out as a trademark and patent attorney. By depriving Plaintiff of his rights, he has been and continues to be irreparably injured by compensable injuries to his reputation, and by obstruction of justice, by mistakes, back-dating,

11

inequitable conduct, possible fraud and deception, threats, coercion or "strategic mooting" to waive an investigation that is barred by the Statute of Limitations.

Barry v. Barchi, *Id.*, and Parker v. Chakrabarty, 477 U.S. 303 (1980) are just two of the many cases in which the Courts have intervened and overruled such obstruction of justice and overreaching *prior restraint* of applicants publications by the PTO. The defendant Chakrabarty was an Indian who was used to discrimination. Like Plaintiff in this case, he is an obscure patent applicant, but discriminated against by *prior restraint*. Plaintiff is discriminated against because he is an obscure, aged author who because of his age and undisputed, life-function, physical disabilities needs reasonable accommodations that are withheld from him by the Defendants.

The Plaintiff, like all other attorneys, seeks to utilize the publishing services of the Patent Office, at least in part, because it is perhaps the largest publisher in the world. As obscure authors and attorneys everywhere do, they frequently have to resort to the intervention by the Courts to overcome *prior restraint* and discrimination by the Patent Office to protect their Constitutional right to utilize the speech and publishing services of the PTO. They frequently, in almost all cases, resort with global equality to advertisement of their names and occupations in an open letter to the public in connection with what many would find unimportant obscure but important political and religious activities that need protection from government discrimination. And the Court in Chakrabarty *Id.*, held that the applicant there, like the Plaintiff here, or any other obscure attorney in the world, whether in need of reasonable accommodations or not, under various statutes protecting his rights as an aged or needy citizen or not, has the same universal, free, unencumbered liberty, property, and religious Constitutional rights of access to the Court to ask for intervention to protect those right by gaining access to the publication services of the

12

PTO, and to advertise his name and occupation over the objections of the PTO under 35 U.S.C. 2 (b)(2)(D), 6, 32 and 33, or otherwise.

This is not merely an appeal for review of the Administrative record, but review of the stated, irrational, clearly erroneous and unauthorized policy of *prior restraint* by the Defendants under 35 U.S.C. 2 (b)(2)(D), 6, 32 and 33. This case and dispute equally applies to Defendants' stated, irrational, clearly erroneous and unauthorized policies of *prior restraint* under 37 C.F.R. 10.32 Advertising; 10.7 Requirements for Registration; 10.9 Limited Registration; 10.10 Restriction on Pracitce;10.11 Removing names from the register, under which the Defendants irrationally use 35 U.S.C. 2 (b)(2)(D), 6 and 32 unconstitutionally to allow the irrational revocation of Plaintiff's state and PTO licenses to practice by discretion and discretion of officials not authorized by Congress under Article II, Section 2, cl. 2. The same irrational behavior is at stake under 37 C.F.R. 10.14 Individuals who may practice before the Office in trademark and other non-patent cases; 10.15 Refusal to recognize a practitioner; 10.154 Initial decision of administrative law judge; 10.160 Petition for reinstatement.

The attached proposed Order favors Plaintiff's request to Grant Plaintiff's Motion For Preliminary Injunction to enjoin Defendants from *prior restraint* of Plaintiff's publication of his religious, political, artistic, creative, technical, patentable and copyrightable *Design* and trademark. Plaintiff has a Constitutional right to advertise the religious, political, artistic, creative and technical expression of his name and profession as an attorney in connection with the publication of a personal "icon" and trademark, as a source of his services in the fields of intellectual property law and religion, particularly in connection with his authorization under Section 212 (j) of the Judiciary Law to solemnize marriages in New York State.

13

That is one of the "utilities" claimed under the First Amendment, and it must be accepted under 35 U.S.C. 101 and 112 for the design and trademark disclosed in his patent and trademark applications, and the initial burden is on the Defendants to establish a *prima facie* case and provide evidentiary support thereof. In re Gaubert, 524 F.2d 1222, 1224, 187 USPQ 664, 666 (CCPA 1975); In re Gottlieb, 328 F.2d 1016, 1019, 140 USPQ 665, 668 (CCPA 1964). "Accordingly, the PTO [Defendants] must do more than merely question operability – it must set forth factual reasons which would lead one skilled in the art to question the objective truth of the statement of operability." *See* also Fregeau v. Mossinghoff, 776 F.2d 1034, 227 USPQ 848 (Fed. Cir. 1985)(applying *prima facie* case law to 35 U.S.C. 101, which corresponds to the *prima facie* case law requirement under the First Amendment in this Court in Denying Defendants' Motion to Dismiss, and Motion For Summary Judgment, and in granting Plaintiff Motion For A Preliminary Injunction under 35 U.S.C. 2 (b)(2)(D). There is no predetermined amount or character of evidence that must be provided by an attorney to support an asserted utility, and the attorney does not have to provide evidence that the assertion is true "beyond a reasonable doubt." In re Irons, 340 F.2d 974, 978, 144 USPQ 351 (CCPA 1965). A likelihood of truth is all that is required.

An attorney' assertion of utility creates a presumption of utility that will be sufficient to satisfy the utility requirement of 35 U.S.C. 101. *See* In re Jolles, 628 F,2d 1322, 206 USPQ 885 (CCPA 1980); In re Irons, 340 F.2d 974, 144 USPQ 351 (CCPA 1965); In re Langer, 503 F.2d 1380, 183 USPQ 288 (CCPA 1974); In re Sichert, 566 F.2d 1154, 1159, 196 USPQ 209, 212-213 (CCPA 1977). Only one utility is required, but several may be alleged even if one of them is inoperable. If one credible assertion of utility is made, utility as a whole is established regardless of the category of invention. It is not necessary to support the expressed utility or category of

14

focus, and the PTO cannot require an applicant to strike nonessential assertions. The attorney's statements must be accepted relating to utility, regardless of the technical accuracy of the statement or assertion it presents. MPEP 2107.02.

In view of the above, the attached proposed Order favors Plaintiff in Denying Defendants' Motion To Dismiss or, Alternately For Summary Judgment despite any limitation set forth in Bell Atlantic, Corp. v. Twombly, et al., (No. 05-1126) 425 F.3d 99, 200 U.S. 321 (2007); Conley v. Gibson, 355 U.S. 41; and Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574.

However, Plaintiff's attached Motion requests reopening the Record, in part for discovery of the full Administrative Record of Defendants' attempt to "govern the recognition and conduct of the Plaintiff," which the Defendant failed to do in Moatz v. Burmeister. Reference is made to Proceeding No. D99-10 before an Administrative Law Judge in the USPTO. *See* "Initial Decision" of March 14, 2006.

This instant case is not merely about the lack of Congressional authorization of Defendants to govern the recognition and conduct of agents and attorneys before the USPTO under Article II, Section 2, cl. 2 of the Constitution, according to Plaintiff's Summons and Complaint. In this regard, it is not merely or even about the need to narrowly tailor the authorization of the PTO by Congress under 35 U.S.C. 2 (b) (2) (D), 6 and 32, "to govern the recognition and conduct of agents and attorneys, or other persons representing applicants or other parties having business before the USPTO," as Defendants allege on page 3, line 5 *et. Seq.*, of their 10/16/07 Answer [7] to Plaintiff's Summons and Complaint.

It is initially, at least in large part, about Plaintiff's universally accepted and long well recognized Constitutional rights. And Plaintiff, like so many others before him, is asserting his

well established right to access in Court to assert the "utility" of the PTO to publish his name and occupation without *prior restraint* in connection with, not only his unimportant musing or advertisements, to which many might not want to  attribute any "utility" on their own, but instead, rather, his Constitutional right to use the PTO to publish what Plaintiff asserts is a true and non-deceiving, technical, artistic, creative, and religious musing, statements and advertisement, whose "utility" is universally accepted with global equality to be about "anything under the sun that is made by man."  Chakabarty, *Id.* (albeit, "utility" is clearly not lacking under 35 U.S.C. 101 or 112, as in "land fill;" immoral; illegal; or barred by statute, as in 35 U.S.C181).

Discovery is now in progress, but has not been completed, and Plaintiff seeks a reopening of the Record and an enlargement of time to complete Discovery and make the Record more complete.

Discovery is now in progress on the basis of Plaintiff's interrogatories in the hands of Defendants' attorneys for reply.  The interrogatories have not yet been answered, and Defendants' attorneys have not made any effort to abort the same in favor of their Motion to Dismiss.  Indeed, they have sought to delay a Decision on their Motion to Dismiss by Moving for an extension of time and an enlargement of time in their Motions on 12/30/07 and 1/4/08 until February 7, 2008. An extension of time will allow Defendants to complete at least a portion of the Discovery that Plaintiff seeks, to allow reopening of the Record, to allow Plaintiff's Motion for an enlargement of time for discovery, and the granting of Plaintiff's Motion for a Preliminary Injunction and the Denial of Defendants' Motion to Dismiss in view of the Record as it exists.  To this end, Plaintiff submits the following:

16

Back ground For Challenge of Facial Unconstitutional Statutes 35 U.S.C 2 (b)(2)(D), 6 and 32

Specifically, Plaintiff seeks to advance this case to issue concerning Defendants' *prior restraint* with or without the existing Administrative Record, which involves this Court's well established  discretion to intervene on behalf of Plaintiff's challenge to the facially unconstitutional statutes, namely: 35 U.S.C. 2 (b)(2)(D), 6 and 32, because they are vague and indefinite, and have been used unconstitutionally to suppress Plaintiff's speech, press and religion by *prior restraint,* including the subject matter and source of his religious, political, artistic, creative, technical, patentable and copyrightable expressions, such as those found and illustrated in his Trademark and Patent Applications S.N's 29/273,235, filed 2/26/07; and 77/247,319, filed 08/04/07. Reopening of the Record has been requested to include the file histories of those cases for the Court's consideration.

Accordingly, Plaintiff has made a Motion to reopen the Record, and for an Order requiring Defendants to make available to Plaintiff for copying, the relevant files in the possession of the Defendants, both under Plaintiff's FOIA requests and otherwise.

The subject matter of Plaintiff's protectable expressions can be understood from Plaintiff's Motion for an Order that requires Defendants to make copies of his spotless record, including a single complaint lacking in any finding of misconduct, that has been waived by Defendants in favor of Plaintiff, and which is objected to as inadmissible, unenforceable and barred by the Statute of Limitations.  Plaintiff's Motion seeks to Reopen the Record for certified copies of the cited applications and the file histories in those cases for copying for the record before this Court, as well as all those other Administrative Records concerning the Plaintiff in the possession of the Defendants, which have long been under consideration by Defendants in

17

accordance with Plaintiff's FOIA requests, as will appear from the "full" Record that would become available by reopening the Record.

This is a Memorandum of Points and Authorities in Support of Plaintiff's Motion for An Order to Defendants to Reopen the Record, and to Supply Administrative Records for copying under Plaintiff's FOIA Request and Otherwise; and for an Enlargement of Time Because of Unavoidable and Unintentional Delay by the parties.

This will enable Plaintiff to further show the Court how a Preliminary Injunction does not depend on the Administrative Record, but, nevertheless is relevant to Defendants' repeated efforts to Answer Plaintiff's summons and complaint with arguments based upon an alleged failure of Plaintiff to exhaust his Administrative Remedies and to appeal in a timely manner.  In any event, the Administrative Record is not required for a constitutional challenge of the cited statutes and regulations up to and including the Commissioner, and in otherwise obtaining a "final decision" on October 4, 2007, and timely filing his Complaint on September 26, 2007.

To this end, Plaintiff inspected his July 16th and 17th Registration Examination, on October 4, 2007, in order to get Defendants to change the date of their "final decision" on August 22, 2007 and to correct the date from August 22, 2007 to October 4, 2007.   Plaintiff promptly and timely requested correction of the date of the "final decision" of August 22, 2007, which restrained, suppressed and coerced Plaintiff by *prior restraint* from using or printing the subject matter of the design of Plaintiff's religious icon and other expressions, or his name and occupation as an attorney in his cited pending applications (albeit, Plaintiff has also asked the Court for the critical date to be tolled if necessary to retain jurisdiction because of unavoidable delay for at least four days from August 22nd to August 26, 2007, which is 30 days before the filing of Plaintiff's complaint on September 25, 2007).

18

In note 14 on page 17 of Defendants' 10/16/07 Answer [7], they acknowledge Plaintiff's request for reconsideration and correction by changing the date of the "final decision" of August 22, 2007. Defendants admit that the ID on the examination Plaintiff took was 19240, whereas the letter of August 33, 2007 carried a different ID, namely 41361. As admitted by Defendants, they secretly and surreptitiously without telling Plaintiff and in hindsight attempted to change Plaintiff's ID retroactively, but no substantiating evidence has been given for such a retroactive *ex post facto* change, thus making Plaintiff's complaint necessary, although unavoidably delayed. Plaintiff's ID on the examination when he took the examination was not the ID given in the "final decision" of August 22, 2007.

Plaintiff's well established ID was 19240, and had been 19240 since November 5, 1958. That was the ID given on the 2007 Examination, which Defendants have made relevant to the appeal in this case, but it was not the ID on the examination Plaintiff reviewed on October 4, 2007. Plaintiff's ID was surreptitiously tampered with and secretly changed between July 17th and October 4th 2007. If what Defendants say can be believed without discoverable substantiating evidence, Plaintiff's ID was changed from 19240 to 41,361 in a fraudulent attempt to change the date of their "final decision" from October 4, 2007 retroactively back to August 22, 2007 by back dating their letter of August 22, 2007. That fraudulent attempt is inconsistent with the uncertain dates alleged in Exhibits 8, 17, 31 and 33 in their filings [7] on 10/16/07.

Furthermore, Defendants' failed to note on 10/16/07 in their Answer [7] that Plaintiff requested correction of the date of the "final decision" of August 22, 2007 because the "final decision" of August 22, 2007 was incorrect in not correctly identifying the examination Plaintiff took on July 16th and 17th. The letter of August 22, 2007, listed only the examination given on July 16[th.]

The exam Plaintiff did not take, however, was given on July 16[th.] That was the date of the exam that was given on that date because it was designed to be given only to, and was limited to healthy, young, mostly white, male, first-time, test takers, whereas the exam given on July 16th and 17 was clearly given under different conditions to a different set of non-first-time test-takers, including test number ID's that were incorrect and secretly changed so as to distinguish the two different sets of test-takers. Presumably the difference in the dates of the exams given was not only to provide reasonable accommodations, but also to give entirely different exams for different results, i.e., one was harder or easier to pass than the other. The latter July 16th and 17th test was given to an entirely different group of test-takers under entirely different conditions for different purposes. It was given to Plaintiff as a test-taker for whom there was a presumption of "competence" and "qualification" due to having passed the examination at least once on November 5, 1958, and having practiced successfully with a spotless record since that date forward (albeit, a single complaint was disposed of by a *waiver* of an investigation on March 4, 1996, and enforcement thereof has long since been barred by the Statute of Limitations). That waiver, and a "strategic mooting" of the transformation of Plaintiff's "qualifications" and "competence" from an "attorney" to an "agent" disposed of the investigation by holding it endlessly in "abeyance, as indicated by the letters of March 4, 1956 and June 15, 2000 in Exhibits 8 and 33 [7 and 24 on March 4, 1996 and 12/20].

The *waiver* had first been made manifest by coercing Plaintiff into silence, and by a "strategic mooting" and holding of an investigation now barred by the statute of limitation in abeyance on March 4, 1995 in Exhibit 8 [in filing 7]. That "strategic mooting" and *waiver* automatically transformed Plaintiff's "qualifications" and presumption of "competence" under his registration by coercing Plaintiff to believe he would only have to reapply for reinstatement

20

to take the Patent Office examination "If your name is removed from the register..." and only

with a constitutionally sufficient notice, not by a secret tampering of his ID from the register of

attorneys and/or the register of agents in conformance with a notice from the Plaintiff on

February 8, 1995. Such a secret tampering without constitutionally sufficient notice to Plaintiff

was made by a handwritten secret note on the letter of March 4, 1996 in Exhibit 8 [filing 7].

The reason that the mistake was admitted on October 16, 2007, was to conceal the real

reason for the attempted retroactive *ex post facto* correction of the date of the "final decision"

from October 4, 2007 back to August 22, 2007. The real reason was to correct the date of the

"final decision." In fact, Plaintiff required Defendants to correct the date to October 4, 2007.

Defendants were unable to abort their attempt to move the "final decision" of *prior restraint*

from October 4, 2007 to August 22, 2007. Thus, Plaintiff's complaint was made to be "timely"

and well within the "critical" date of 30 days before the filing of the complaint on September 26,

2007. Consequently, tolling is not necessary because this thwarted Defendants' attempt to

obstruct justice and thwarted their attempt to suppress Plaintiff's right to a trial by their Motion

to Dismiss and their repeated, inaccurate and unjustified arguments of lack of a final

administrative decision or a timely appeal to this Court.

In contrast to Moatz v. Burmeister, *Id.*, Plaintiff has moved to reopen the Administrative

Record. That Record is simply another reason to Deny Defendants' Motion to Dismiss, and to

Grant Plaintiff's Motion for Preliminary Injunction in favor of Plaintiff. If for no other reason

the Record should be Reopened because of the many inaccuracies and mistakes shown by the

Defendants in their Administrative Record supplied by them, including, for example, by

reference to note 2 on page 2 of I Procedural History of Initial Decision in Burmeister, *Id.*,

where April 23, 2000 is given as the date "Mr. Moatz was formally appointed as the Director of

the Office of Enrollment and Discipline," which is inconsistent with Defendant Moatz' 10/9/07
Affidavit in Exhibit 33 [7], which states in paragraph that he was "OED Director (1999 to
present).

    This is only one of the instances showing that Defendants are still attempting to rewrite
history by their *ex post facto* attempt to retroactively change the date of their *waiver* of Plaintiff's
"removal" from the registry of "agents" to some still uncertain date, including, for example, on
March 4, 1995, by their "strategic mooting" of his practice in the Trademark Office by coercion
and holding an "investigation" barred by the statute of limitations in "abeyance." A date of
sometime in April 1996 was proposed on March 22, 2005 by Defendant Griffin in Exhibit 17 [7
and 24]. See also letters dated March 4, 1996 and June 15, 2000 in Exhibits 8 and 33 [7 and 24],
which put the date as late as December 31, 1996, or possibly as late as June 15, 2000, whereas
Exhibit 31 [7 and 24] puts it as late as 12/26/06 or later to between July 17th 2007 and October 4,
2007, when Defendants changed Plaintiff July 2007 test ID and the date of their "final decision"
of August 22, 2007 to October 4, 2007 upon notice to Plaintiff when he was notified of the
corrected "final decision."

    Another attempt to rewrite history is illustrated by Defendant Moatz' affidavit in Exhibit
33 [7]. Defendant Moatz there stipulated that he "foresees no reason that Mr. Cornish would not
be granted the same accommodations provided to him for the July 2007 examination." But that
says nothing about other reasonable accommodations requested by Plaintiff and refused by
Defendants, or the inconsistencies and inaccuracies in Defendants allegations on pages 15, 16, 25
and 27 of their 10/16/07 Answer [7]. There they repeatedly claim that "All," "all," "*all*" and
"all" of the requested reasonable accommodations have been supplied. But, as shown in the
attached "Supplemental Amendment..." received and date stamped September 12, 2006,

Plaintiff clearly asked for an enlarged print MPEP, which was refused in the July 2007 examination.

Presumably, the reasonable accommodations stipulated by Defendant Moatz include the "reasonable accommodation" of Plaintiff's continuing "qualification" to ask for "reinstatement" to take the July 2008 examination with reasonable accommodations for Continuing Legal Education purposes, or other purely academic reasons, despite Plaintiff's suit for a Preliminary Injunction to enjoin Defendant Moatz from *prior restraint* of the denial of the reasonable accommodations requested and refused in Plaintiff's appeal to the Commissioner and his refusal in his 10/16/07 Answer [7]. Only the threat of an Order granting Plaintiff's request for a Preliminary Injunction enjoining Defendants from refusing to grant the stipulated reasonable accommodations, and a threat of a contempt of Court will insure the certainty of the stipulated reasonable accommodations.

Respectfully submitted,

*Cornell O. M. Judge Cornish*

Cornell D.M. Judge Cornish
1101 New Hampshire Ave., NW
Suite 301
Washington, DC 20037
(202) 429-9705
cornishj@erols.com

Date: 1/22/08

23

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that service of the foregoing Plaintiff's Unopposed Motion for

Enlargement of Time, and Memorandum in Support, and in Support of Plaintiff's Motion to

Defer Issues and Controversies that are not ripe for determination until February 28, 2008, have

been hand delivering a copy thereof to:

W. Mark Nebeker
Assistant United States Attorney
Civil Division
555 4th Street, NW
Washington, DC 20530
(202) 514-7230 fax (202) 514-8780

on this 22nd day of January, 2008.

*Cornell D. M. Judge Cornish*

Cornell D.M. Judge
1101 New Hampshire Ave., NW
Suite 301
Washington, DC 20037-1502
(202) 429-9705
cornishj@erols.com

Encl:

E-mail 12/11/07 to mark.nebeker@USDOJ.gov
USPTO-generated mark image: S.N. 77/247,319, filed 08/04/07
Final Report: Current Status of Pro Bono Service...Md, Year 2004

Date:    1/22/08

UNITED STATES DISTRICT COURT FOR
**THE DISTRICT OF COLUMBIA**

CORNELL D.M. JUDGE CORNISH,          )
                                     )
                 Plaintiff *Pro Se*  )
                                     )
        v.                           )    CASE 07-cv-01719 (RWR)
                                     )
JON DUDAS, et al.,                   )
                                     )
                 Defendants          )
_____ )

ORDER

UPON CONSIDERATION of Plaintiff's Motion to Reopen the Record, For Leave to File

under Seal, And Memorandum in Support Thereof, and the grounds stated therefore, and the

entire record herein, it is on this _____ day of _____, 2007, hereby

Ordered that Plaintiff's motion should be and it is hereby granted; and it is,

FURTHER ORDERED the Defendants' Motion to Dismiss is hereby Denied..

_____
**UNITED STATES DISTRICT JUDGE**

W. MARK NEBEKER                 Cornell D.M. Judge Cornish
Assistant U.S. Attorney         Suite 301
555 4th Streets, NW              1101 New Hampshire Ave., NW
Civil Division                  Washington, DC 20037-1502
Washington, DC 20530

8

## judge

**From:**     "judge" <cornishj@erols.com>
**To:**       <mark.nebeker@USDOJ.gov>
**Cc:**       <cornishj@erols.com>
**Sent:**     Wednesday, December 12, 2007 9:02 AM
**Subject:**  Interrogatories/Discovery

Dear Mr. Nebeker:

Our private search for discovery information avenues has been stymied so far. Confirming our conversation of December 11, 2007, we enclose the following list for your inquiry to the Defendants in lieu of regular discovery, for which we are intending to file a Motion for enlargement of time. Please let us know what you can find out concerning the following interrogatories:

1.  The name Cornish in the Notices in the Official Gazette.
2.  The person to call concerning PTO computer print-outs    of the name Cornish in the Official Gazette.
3.  The person to call for documents relating the status of    Plaintiff's FOIA requests to OED.
4.  The availability of Plaintiff's EEO requests in the PTO    Office of Civil Rights other than through the
        Defendants' attorney if your Motion to Dismiss cv-        1719 is granted.
5.  The availability of documents and citations under    37 C.F.R.10.159 or revisions within the last 10
years.
6.     The availability of a list of attorneys sworn    in on motion or by waiver or suspension of the
        Rules in the last 10 years.
7.  The status of Plaintiff's Petition for Review in OED        dated 5/21/07.

Thanks for your help or comments.

Cornell D.M. Judge Cornish
cornishj@erols.com

**USPTO-generated mark image:**

# Cornell D.M. Judge Cornish

# Downpat

**NOTE:** For how the USPTO determines what the display of the entered mark will be, click here

Close Window

Cornell D. M. Judge Cornish
Downpat
(Trademark)
Patent Copies/Searching Svs.

*Final Report:*

# Current Status of Pro Bono Service Among Maryland Lawyers, Year 2004

*OCTOBER 11, 2005*

*PREPARED BY:*
*ANASYS, INC.*

**ADMINISTRATIVE OFFICE OF THE COURTS**
**580 TAYLOR AVENUE, 2ND FLOOR**
**ANNAPOLIS, MARYLAND 21401**

**Frank Broccolina**
**State Court Administrator**

•       The total financial contribution to organizations that provide legal services to people of limited means (Question 4) was $2,821,759 from 5,530 contributing lawyers.

•       More than 60 percent of "Family" pro bono service was provided by lawyers in three practice areas – Family/Domestic, Litigation, and General practice.

•       Among those lawyers who filed the pro bono report for all three years, the proportion of full time lawyers who provided 50 or more pro bono hours increased from 22.1 percent in 2002 to 23.9 percent in 2004.

•       Among the lawyers who were prohibited to render pro bono service by statute (Question 5), the proportion of lawyers with pro bono service is only about one-sixth of the proportion among full time lawyers. In comparison, part time lawyers (Question 7) reported pro bono activities close to the level of full time lawyers.

•       With the exception of lawyers in Corporate/Business and Litigation, lawyers in practice areas where pro bono activities are lower tend to compensate their lack of pro bono activities by making financial contributions.

# TABLE OF CONTENTS

*EXECUTIVE SUMMARY* .......................................................... *i*

**I.**    *INTRODUCTION* .......................................................... *1*

**II.**   *GENERAL PRACTICE CHARACTERISTICS OF MARYLAND LAWYERS* .......... *3*

     *II.1.*   *Geographical Location* .................................... *3*
     *II.2.*   *Year of Bar Admittance* ................................. *6*
     *II.3.*   *Primary Practice Area* .................................. *7*

**III.** *PRO BONO SERVICE* .................................................. *9*

     *III.1.*   *Pro Bono Service by Geographic Location* .............. *9*
     *III.2.*   *Beneficiaries of Pro Bono Service* .................... *13*
     *III.3.*   *Practice Area and Pro Bono Service* .................. *14*
     *III.4.*   *Hours to Improve Law and Financial Contributions* .... *16*

**IV.**   *CHANGES IN PRO BONO HOURS* ................................. *19*

**V.**    *CONCLUSION* ........................................................ *23*

## TABLES AND CHARTS

| Table 1. | Location of Lawyers | 3 |
|---|---|---|
| Table 2. | First-choice Jurisdiction | 4 |
| Table 3. | All Selected Jurisdictions, 2004 | 5 |
| Table 4. | Mean and Median Bar Admittance Year by States, 2004 | 6 |
| Table 5. | Primary Practice Area, 2004 | 7 |
| Table 6. | Comparison of Primary Practice Area by Location | 8 |
| Table 7. | Changes in Lawyers with Pro Bono Activity | 9 |
| Table 8. | Pro Bono Hours of Full Time and Other Lawyers by Region, 2004 | 11 |
| Table 9. | Pro Bono Hours of Full Time and Other Lawyers by Region – Change from 2003 | 11 |
| Table 10. | Maryland Counties by Percentage of Lawyers with 50 or More Pro Bono Hours, 2004 | 13 |
| Table 11. | Distribution of Pro Bono Services by Beneficiary Type, 2004 | 14 |
| Table 12. | Proportion of Pro Bono Hours Spent on Cases from a Pro Bono or a Legal Services Organization | 14 |
| Table 13. | Comparison of Practice Areas, 2004 | 15 |
| Table 14. | Percent of Lawyers who provide Pro Bono Service - by Practice Areas, 2004 | 15 |
| Table 15. | Pro Bono Service Areas and Practice Areas, 2004 | 16 |
| Table 16. | Distribution of Hours to Improve Law and Financial Contributions, 2004 | 17 |
| Table 17. | Lawyers with Financial Contribution – by Practice Area, 2004 | 18 |
| Table 18. | Proportion of Lawyers with Pro Bono Service by Reporting Status | 20 |
| Table 19. | Distribution of Lawyers by their Changes in Pro Bono Hours | 21 |
| Table 20. | Changes in Pro Bono Hours by Geographical Location | 22 |

-----

| Chart 1. | Number of Lawyers by Bar Admittance Year | 6 |
|---|---|---|
| Chart 2. | Percent of Lawyers with Any Pro Bono Hours by Region | 10 |
| Chart 3. | Percent of Lawyers with Any Pro Bono Hours by County | 10 |
| Chart 4. | Maryland Counties by Percentage of Full Time Lawyers with 50 or More Pro Bono Hours | 12 |
| Chart 5. | Proportion of Lawyers who reported Greater Than '0' Pro Bono Hours by Year | 19 |
| Chart 6. | Proportion of Full Time Lawyers with 50 or more Pro Bono Hours | 20 |
| Chart 7. | Changes of Pro Bono Activities among 1,645 Lawyers Prohibited To Render Pro Bono Service in Year 2002 | 21 |

*1-17-06*

### KEY FINDINGS FROM
### 2004 MARYLAND PRO BONO REPORTING RESULTS

Maryland Rule 16-903 (effective July 1, 2002) requires all Maryland attorneys authorized to practice law in the state to annually report on their pro bono activities. The definition of pro bono service was redefined by the Court of Appeals in Rule 6.1 with an "aspirational" goal of 50 hours of service for full-time practitioners with a "substantial portion" of those hours dedicated to legal services to people of limited means.

The Administrative Office of the Courts contracted with an independent company (ANASYS) to administer the process and compile the reporting results. There are now three years of reporting results to review and analyze. Some of the key findings from the *Current Status of Pro Bono Service Among Maryland Lawyers, Year 2004* report are summarized below. The most notable observation is that there has been a **steady increase** in: 1) **the number of pro bono hours; 2) the percentage of lawyers participating in pro bono activities; and 3) the percentage of lawyers providing more than 50 hours of pro bono legal service per year.**

**Compliance Rate**
- 31,226 Maryland lawyers **filed their pro bono service report** by the final cutoff date and were included in the report (representing a **99% compliance rate**).

**Amount of Pro Bono Service**
- Among all licensed lawyers, **47.9% reported engaging in some** type of pro bono activity. **Among full-time lawyers practicing in Maryland, that number increases to 63.2%.**

- Lawyers who **filed for all three reporting years, are rendering pro bono services at an increasing rate with 49.6%** reporting pro bono hours.

- **Lawyers provided a total of 1,071, 968 hours** of representational pro bono legal service in 2004 (a four percent increase over 2003.) They gave an additional 442,257 hours to improve the law, legal system or legal profession **totaling over 1.5 million hours of pro bono service.**

- Among all lawyers, 23.1% reported 50 hours or more of pro bono service while among **full-time lawyers, 24% reported donating more than 50 hours**.

**Type of Pro Bono Service**
- Tracking Rule 6.1, the breakdown of services provided by Maryland lawyers was as follows:
  - **52.2% rendered their services to people of limited means;**
  - 14.8% assisted organizations serving people of limited means;
  - 6.3% worked with entities on civil rights matters; and
  - 26.8% gave organizational help to non-profits.

- Of those hours donated directly to assist people of limited means, 33.7% were referred through a pro bono or legal services organization.

### EXECUTIVE SUMMARY

With the adoption of Maryland Rule 16-903, the Court of Appeals of Maryland required all licensed Maryland attorneys to report annually on their pro bono activities. This summary report presents results from the data collected from the Pro Bono Service Report for Year 2004. Below are the major findings from their reporting.

• Among 31,226 Maryland lawyers, 47.9 percent (14,964 lawyers) reported some pro bono activity, a slight increase of 0.5 percent from Year 2003.

• The total number of pro bono hours rendered in 2004 was 1,071,968 a 4.0 percent increase from Year 2003.

• Lawyers who filed the pro bono report for all three years, 2002 - 2004 are providing pro bono activities at an increasing rate, albeit slowly - from 48.9 percent in 2002 to 49.6 percent in 2004.

• Among full time lawyers, the proportion of lawyers who reported greater than '0' pro bono hours increased from 58.3 percent in 2002 to 59.4 percent in 2004. However, during the same period, the proportion of other lawyers (not full time) who reported greater than '0' pro bono hours decreased from 28.0 percent in 2002 to 27.2 percent in 2004.

• Among full time lawyers, 23.1 percent of lawyers provided 50 or more hours of pro bono service during Year 2004.

• Higher proportions of lawyers in rural areas of Maryland rendered pro bono services compared with lawyers in metropolitan regions.

• Western Region of Maryland reported the highest percentage of lawyers with 50 or more pro bono hours among full time lawyers, followed by the Eastern Region.

• Garrett County ranked first in Year 2004 with 45.0 percent of full time lawyers with 50 or more pro bono hours, followed by Dorchester (42.1 percent), Somerset (40.0 percent), Worcester (38.1 percent), and Frederick (37.4 percent) counties.

• Baltimore City ranked the lowest with 21.1 percent of full time lawyers with 50 or more pro bono hours, followed by Anne Arundel County (22.9 percent), Baltimore County (23.3 percent), Howard County (23.3 percent), and Montgomery County (24.1 percent).

• The Family/Domestic practice area was the top pro bono service area while it was the seventh ranked primary practice area.

• A total of 7,107 lawyers spent 442,257 hours participating in activities for improving the law, the legal system, or the legal profession (Question 3) – a 10 percent increase from Year 2003.

**Geographic Distribution**
- The **Eastern Shore and Western Maryland** continued to **have higher proportions** of lawyers rendering pro bono services than lawyers in other regions.

- **Western Maryland** reported the **highest percentage of lawyers with 50 hours** or more of pro bono service (34%) **followed by the Eastern Shore.** Garrett County ranked first with 45% of full-time lawyers reporting 50 or more hours followed by Dorchester (42.1%), Somerset (40%), Worcester (38.1%), and Frederick (37.4%) counties. Those with the lowest participation rates included: Baltimore City, Anne Arundel, Montgomery, Cecil, Howard and Prince George's counties.

**Practice Areas**
- The **largest number of pro bono hours** was donated in the **family/domestic** practice area even though family/domestic law ranked seventh as a primary practice area. About 60% of the family law pro bono service was rendered by lawyers who identified their primary practice areas as family, litigation or general.

- Lawyers generally provide a **high percentage of their pro bono service in their primary practice area.** Those in certain practice areas tend to **proportionately provide more pro bono service hours.** The top areas include:
  - Family Law – 71.1%
  - Elder Law – 67.2%
  - Trusts and Estates – 66%
  - Bankruptcy/Commercial – 64.5%
  - General Practice – 63.9%
  - Litigation – 63.2%

- Those lawyers not engaged in pro bono service tend to be younger and in practice areas such as government, banking/finance, insurance, and intellectual property.

**Financial Contributions**
- The **total financial contribution** to organizations that provide legal services to people of limited means was **$2,821,759. An overall higher percentage of lawyers made financial contributions in 2004.**

- With the exception of lawyers in corporate/business and litigation practice areas, those in practice areas with less participation tend to compensate by making greater financial contributions to legal services organizations.

\*                    \*                    \*                    \*

*Summarized by the Standing Committee on Pro Bono Legal Service and the Pro Bono Resource Center of Maryland.*
*The full report can be found at: www.courts.state.md.us.*

*Special thanks to the Department of Family Administration, Administrative Office of the Courts and ANASYS for compiling and presenting this data.*

2

## I.  INTRODUCTION

Pursuant to Rule 16-903, annual filing of the Pro Bono Legal Service Report is mandatory for all lawyers certified to practice in the State of Maryland. The Maryland Administrative Office of the Courts is responsible for managing the reporting process and for reporting the results to the Court of Appeals. The Maryland Administrative Office of the Courts engaged ANASYS, Inc. (ANASYS) to assist them in managing the reporting process and in compiling and analyzing the data. This report summarizes the results from the third year for which pro bono reporting was required, Calendar Year 2004.

For Year 2004, four mailings were sent out to all licensed Maryland attorneys.

- First round: An initial mailing was sent out on January 3, 2005 to all lawyers who were on the active lawyers' list as maintained by the Maryland Client Protection Fund (CPF).

- Second round: A mailing was sent out on March 21, 2005 to 6,302 lawyers who had not filed their pro bono report by March 15, 2005.

- Third round: A 'Notice of Failure to File' was sent out on May 25, 2005 to 1,832 lawyers who had not filed their pro bono report by May 15, 2005, and

- Fourth round: A 'Decertification Order' signed by the Court of Appeals was sent out